34 F.3d 635
 Harold Lamont OTEY, Appellant,
v.
Donald B. STENBERG, Attorney General of the State of
Nebraska; E. Benjamin Nelson, Governor of the State of
Nebraska; Allen Beermann, Secretary of State of the State
of Nebraska; and Frank X. Hopkins, Warden of the Nebraska
State Penitentiary, Appellees.
 No. 94-3095.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Aug. 30, 1994.
Decided Aug. 31, 1994.
 
 Shawn D. Renner, Lincoln, NE, argued, for appellant.
 J. Kirk Brown, Lincoln, NE, argued, for appellee.
 Before BOWMAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MAGILL, Circuit Judge.
 MAGILL, Circuit Judge.
 
 A. DUE PROCESS CLAIM
 
 1
 Appellant Otey's core claim in this section 1983 action[1] is that his right to both substantive and procedural due process was violated by the procedure utilized by the Nebraska Board of Pardons (Pardons) at his clemency hearing. He pleaded for mercy that his sentence of death in 1978 for a murder in 1977 be commuted to life. He had voluntarily confessed to first-degree murder in the perpetration of a sexual assault in the first degree. All judicial processes have been exhausted during these intervening sixteen years. See Otey, 5 F.3d at 1126-27.
 
 
 2
 Otey does not challenge any acts by Pardons regarding the submission of his application for clemency, the timeliness of its consideration or the making or preservation of the record of the clemency proceedings. He alleges only that the dual role of the attorney general as one of three decisionmakers on seventy-year-old Pardons and the appearance of two assistant attorneys general in opposition to commutation violated the Due Process Clause of the Fourteenth Amendment by denying him a "genuine opportunity" for clemency.
 
 
 3
 Historically, the role of pardon boards has been to afford relief from undue harshness or evident mistake in the operation or enforcement of the criminal law. Ex parte Grossman, 267 U.S. 87, 121, 45 S.Ct. 332, 337, 69 L.Ed. 527 (1925). In Herrera v. Collins, --- U.S. ----, ----, 113 S.Ct. 853, 868, 122 L.Ed.2d 203 (1993), the Supreme Court held that the appropriate forum in which to raise actual innocence claims is that of executive clemency. Otey makes no such showing. Otey has had his just due, as indicated, in the courts of law these past sixteen years. Although we decide on the merits, it is noted the "decisionmaker" defense, the lack of "recommendation" from Parole, and Parole's "limitation" to investigation were never asserted by Otey during the two-day clemency hearings on June 28 and 29, 1991. Only the appearance of the two assistant attorneys general and their opposition to commutation was contested, which objection was withdrawn by Otey's attorney. J.A. at 89.[2]
 
 
 4
 On substantive due process, Otey asserts five fundamental rights come into constitutional play arising from his decisionmaker claim and the claim that two assistant attorneys general opposed commutation: (1) right to life; (2) a fair decisionmaker; (3) a majority vote; (4) a parole board recommendation; and (5) failure to follow Pardons' policies. In procedural due process, he asserts an entitlement to a liberty interest in a meaningful hearing by a neutral Pardons.
 
 
 5
 No procedural or fundamental constitutional right here creates a protected interest in clemency. Deprivation is lacking. Connecticut Bd. of Pardons v. Dumschat, 452 U.S. 458, 464, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981). We said in Whitmore v. Gaines that "[w]hen a commutation statute does not impose standards constraining the discretion of the board as to when clemency must be granted, the statute does not create a constitutional right or entitlement sufficient to invoke the Due Process Clause." 24 F.3d 1032, 1034 (1994); Pickens v. Tucker, 851 F.Supp. 363, 365 (E.D.Ark.) (rejecting due process claim based on fact that when the governor was attorney general two of his assistant attorneys general participated in the original prosecution of the clemency applicant and that thereafter, as governor, the former attorney general denied the clemency application), aff'd en banc, 23 F.3d 1477 (8th Cir.1994). As recently as July 14, 1994, see Henderson v. Baird, 29 F.3d 464 (8th Cir.1994), this court cited with approval the following language from Hall v. Lombardi, 996 F.2d 954, 958 (8th Cir.1993):
 
 
 6
 As the appellant points out, "[w]e have yet to decide whether substantive due process provides a right to be free from arbitrary and capricious state action." See Weimer v. Amen, 870 F.2d 1400, 1405 (8th Cir.1989).
 
 
 7
 The Nebraska Supreme Court, when discussing whether the Nebraska Constitution or clemency statutes created any substantive rights, stated:
 
 
 8
 [T]here are no provisions in Nebraska's Constitution or in its statutes creating a liberty interest in commutation hearings other than the right to file an application for commutation.... There are no 'substantive predicates' which limit the Board of Pardons' discretion in granting commutations, i.e., no specific criteria which an applicant must meet to earn a commutation from the Board of Pardons, no conditions which must first be met, no specific conduct which the applicant must have avoided, no guidelines of any kind which must be followed by the Board. In short, the Nebraska Board of Pardons has the unfettered discretion to grant or deny a commutation of a lawfully imposed sentence for any reason or for no reason at all.
 
 
 9
 A review of Nebraska's Constitution, statutes, and procedures reveals that no right has been conferred upon Otey beyond the right to seek a commutation. He was afforded this right. Having followed its own procedures in granting him a hearing, having consulted with the Board of Parole, and having considered Otey's application, the Board of Pardons fulfilled any obligation it had to Otey.
 
 
 10
 Otey v. State, 240 Neb. 813, 830, 485 N.W.2d 153, 166 (1992).
 
 
 11
 We recognize that the Nebraska Supreme Court did not decide the case on this ground, and thus this statement is dicta. Although not binding, it comes from the highest court in that state and confirms our own conclusions. Like the clemency statute at issue in Dumschat, the Nebraska clemency statute also is standardless. Otey had no state-created right other than the right to ask for mercy. As in Dumschat, this does not create a protectable interest in clemency. It also does not create a protectable interest in the manner in which the Board receives his request or in having unbiased decisionmakers on the Board. See Smith v. Snow, 722 F.2d 630, 631-32 (11th Cir.1983) (stating that because the Board of Pardons' power was completely discretionary, Dumschat controlled and due process did not attach to the manner in which commutation to a life sentence was considered). Due process never attached to the Nebraska clemency proceedings. Otey's distinction between Dumschat and his own case is a distinction without a difference. Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978), cert. denied, 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979); Bundy v. Dugger, 850 F.2d 1402 (11th Cir.1988), cert. denied, 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989). Neither the Nebraska Constitution nor the clemency statutes impose any limitations or standards whatsoever on Pardons. Clearly this is so on any dual-role on the constituency of Pardons, or the prosecutors' opposition to commutation. There is no right to a hearing. There is no right to a personal appearance. Rules of evidence do not apply. It is a slender reed to invoke fundamental federal constitutional rights asserting the proposition that a prosecutor of a state crime is barred from contesting clemency and the state's attorney general is barred from sitting on a board the sovereign State of Nebraska by law has insisted he sit upon for the past seventy years. To agree with Otey would hardly be federalism at its best. Pleuler v. The State, 11 Neb. 547, 10 N.W. 481 (1881). See also Ex Parte Campion, 79 Neb. 364, 112 N.W. 585 (1907); State ex rel. Randall v. Hall, 125 Neb. 236, 249 N.W. 756 (1933).
 
 
 12
 We affirm the thoughtful and well-reasoned opinion of the district court.[3]
 
 B. EQUAL PROTECTION CLAIM
 
 13
 Otey argues he was treated differently than all prior clemency applicants on the same claims furthered under due process. Commutation in Nebraska has resided in the executive branch since 1866. Neb. Const. art. III, Sec. 12. From 1920 to 1969 the powers to commute and parole were unified in Pardons, consisting of the Governor, the Secretary of State, and the Attorney General. In 1969, the Board of Parole (Parole) was constitutionally created with power to recommend clemency. Since the creation of Parole in 1969, it has never made a recommendation to Pardons in death cases. There is a duty on the part of Parole to advise Pardons only when requested by Pardons. Neb.Rev.Stat. Sec. 83-194 (1993). It has no obligation to make a recommendation when it has not been requested to do so and there was no request with respect to the application of Otey. Parole had no written policy or established procedure with respect to making recommendations on applications for commutation of death sentences. There is no evidence that Parole was prohibited by Pardons from making a recommendation on the application for commutation by Otey.
 
 
 14
 The practice of Parole since 1983, at the latest, has been to make recommendations to Pardons only with respect to sentences of life imprisonment for murder or kidnapping.
 
 
 15
 Otey asserts that Pardons "directed" Parole not to make a recommendation on the merits of his clemency application, although no such direction had ever previously been given by Pardons to Parole. The trial court found the facts were against Otey on this claim. Neither Pardons nor any of its members prohibited Parole from undertaking its duties or from complying with established practices. Parole did what it was requested by Pardons, an investigation. The only legal duty of Pardons vis-a-vis Parole was to "consult ... concerning" the application. It did that, requesting an investigation but not a recommendation.
 
 
 16
 The trial court found no evidence was introduced to the effect that Pardons prohibited Parole from making a full investigation of the application for commutation. An investigation was made, including a video taped interview of Otey, and a report was provided to Pardons. Ronald L. Bartee, chairman of the Board of Parole, consulted both Victor Covalt, the plaintiff's counsel, and Kirk Brown, a member of the staff of the Attorney General, about what Parole's interview of Otey should consist of and both counsel gave suggestions.
 
 
 17
 Further, the trial court found the usual practices of Parole, if it can be said there was any usual practice with respect to applications for commutation by persons suffering from a sentence of death, were not different from those provided Otey. If the practices of Parole with respect to persons serving life sentences be considered as applicable to Otey, which we reject as being in the same class, a recommendation regarding Otey would not have been made, because the practice of Parole has been not to consider making recommendations for commutations until the offender has served 15 calendar years and has been free during the last five years of disciplinary action, a qualification not met by Otey.
 
 
 18
 We conclude that the State of Nebraska has an important interest and objective to further. We hold those interests were furthered in a rational way. The rational relationship standard is appropriate. No argument has been made by Otey that the case involves a suspect class. The trial court found that although the plaintiff is black and speaks of himself "as a black individual, convicted of murdering a white woman," nothing in the evidence suggests that the race of Otey or of the victim has been a factor in any of the commutation proceedings before Pardons. Nor is there any suggestion that the State of Nebraska or any of its agencies has by law or policy or practice established a classification of black persons who have been convicted of murdering white women. We affirm the trial court and reject Otey's assertion that as a death-sentenced clemency applicant, he is similarly situated to all inmate clemency seekers. We affirm the district court.
 
 IT IS ORDERED that:
 
 19
 1. the order of the District Court granting summary judgment for defendants Stenberg, Nelson and Beermann is affirmed;
 
 
 20
 2. the order of the District Court granting defendant Hopkins judgment on the pleadings is affirmed;
 
 
 21
 3. the order of the District Court denying the preliminary injunction is affirmed;
 
 
 22
 4. the order granting the sealing of the deposition is reversed and the request to seal the joint appendix and appellant's brief is denied; and
 
 
 23
 5. the motion for stay of execution is denied.
 
 
 24
 JOHN R. GIBSON, Senior Circuit Judge, dissenting.
 
 
 25
 I respectfully dissent.
 
 
 26
 I believe that the Attorney General's participation in the clemency decision, after acting as the chief prosecuting official in this case, and whose assistants represented the state at the clemency proceedings, deprived Otey of substantive due process.
 
 
 27
 The Supreme Court has recently underscored the significant role clemency plays as a remedy for preventing the miscarriage of justice once the judicial process has been exhausted. In Herrera v. Collins, --- U.S. ----, ----, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993), the Supreme Court, speaking through Justice Rehnquist, held that there is ordinarily no federal habeas review (indeed, no judicial review at all) available for claims of actual innocence based on new evidence discovered after the time for filing a motion for new trial. The appropriate "forum" in which to raise such actual innocence claims is that of executive clemency, which acts as a "fail safe" against executing innocent people. Id. --- U.S. at ----, 113 S.Ct. at 868. By relying on the existence of executive clemency to justify excluding certain kinds of claims from judicial scrutiny, the Court recognized that clemency procedures are an important last step of an effort to avoid execution. This newly recognized and emphasized significance of the clemency process illuminates the constitutional deficiencies in the clemency proceedings.
 
 
 28
 When Otey's case was before us nearly a year ago, I dissented from this court's opinion. Otey has now presented an even more compelling argument for finding a substantive due process violation.
 
 
 29
 While there are superficial similarities between Otey's case and Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981), there is a theoretical divide between Dumschat's reliance on procedural due process and Otey's plea for substantive due process. Dumschat claimed that by granting three-fourths of the applications for commutation of life sentences the Board of Pardons created a constitutional liberty interest or entitlement to commutation, and that he was therefore entitled to a statement of reasons for denial of his application for commutation. Dumschat's claim of an expectation of pardon was far different from Otey's substantive due process claim that the clemency procedures are fundamentally unfair in including the state's chief prosecuting officer as a member of the Board of Pardons. Otey's claim focuses not on a right to receive pardon, but on a right to seek it before an unprejudiced Board.
 
 
 30
 Substantive due process protects individuals from government conduct that "shocks the conscience." Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 209-10, 96 L.Ed. 183 (1952). The idea of a prisoner pleading for his life before a board that includes the very official responsible for his prosecution and conviction is shocking to the judicial conscience.
 
 
 31
 Before 1920, Nebraska vested clemency power in the governor, who had the discretionary power to grant or deny clemency, or take no action. Nebraska established a more formalized procedure in 1920 when it transferred the clemency power to the Board of Pardons. Modifications to the procedure in 1969 gave further structure to clemency proceedings. Nebraska statutes mandate that properly filed clemency requests be considered. See Neb.Rev.Stat. Sec. 83-1, 129 (1987 Reissue). The statutes further mandate that when a petition for clemency is filed, the execution is stayed until the Board rules on the application. Neb.Rev.Stat. Sec. 83-1, 132 (1987 Reissue). The application shall be considered by the Board with or without hearing at its next regular meeting, or within 30 days, whichever is earlier. If a hearing is held, it is to be conducted in an informal manner, but a complete record of the proceedings is to be made and preserved. Neb.Rev.Stat. Sec. 83-1, 129. The State of Nebraska has thus by its constitution and statutes replaced the sole authority of its governor with a structure that governs the deliberations and proceedings of a Board consisting of the Governor, Attorney General and Secretary of State.
 
 
 32
 The participation of the Nebraska attorney general as a voting member of the Board of Pardons hearing Otey's case renders the clemency proceeding fundamentally unfair.[1] Attorney General Stenberg's statements of personal objectivity at the hearing do not cure this defect.[2] By statute, the attorney general advises county attorneys on criminal matters, and appears for the state and prosecutes criminal proceedings in the Supreme Court. See Neb.Rev.Stat. Sec. 84-205 (1987 Reissue). The assistant attorneys general who participated in Otey's prosecution, sentencing, appeals, and clemency hearing did so in the attorney general's name.[3] The attorney general, having successfully obtained affirmance of Otey's death sentence in the Nebraska Supreme Court, and successfully represented the State in Otey's habeas case, can hardly be expected to oppose the execution of this sentence. As prosecutor, the attorney general determined that it served the public welfare to seek the death penalty as the appropriate punishment for Otey. It is unreasonable to assume that the attorney general would freely consider the same sentence inappropriate at a clemency hearing, especially when his own representatives are arguing before him in favor of retaining the sentence. With the attorney general's position fixed, a petitioner must obtain the vote of the other two members of the panel. Otey received one favorable vote, but not both. The State has created a playing field that is tilted toward denial and is therefore fundamentally unfair.
 
 
 33
 Perhaps the Nebraska procedure has systemic constitutional infirmity. We need not reach this issue, however, in view of the actual conflicting roles of the attorney general in Otey's case. This conflict was demonstrated most dramatically by the attorney general's discussion with his assistants of specific aspects of the presentation they would make before the Board.
 
 
 34
 The Supreme Court, in a number of recent opinions, has discussed the nature and expanse of substantive due process. See Albright v. Oliver, --- U.S. ----, ---- ----, 114 S.Ct. 807, 812-13, 127 L.Ed.2d 114 (1994); Collins v. City of Harker Heights, --- U.S. ----, ----, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992); and Planned Parenthood v. Casey, --- U.S. ----, ---- ----, 112 S.Ct. 2791, 2804-05, 120 L.Ed.2d 674 (1992). The Court's discussion establishes that the due process clause protects more than those rights guaranteed by the express provisions of the Bill of Rights. Thus, I am unpersuaded by the argument of the district court and this court that substantive due process requires a liberty interest other than that found in the due process clause itself. We said a few years ago in Meis v. Gunter, 906 F.2d 364, 369 (8th Cir.1990), cert. denied, 498 U.S. 1028, 111 S.Ct. 682, 112 L.Ed.2d 673 (1991), that concepts of liberty and property interests are useful solely in the context of procedural due process.
 
 
 35
 The substantive due process analysis in Mayberry v. Pennsylvania, 400 U.S. 455, 465-66, 91 S.Ct. 499, 505, 27 L.Ed.2d 532 (1971) is compelling. In Mayberry, the defendant was tried and convicted of contempt by the same judge who was the object of many of the personal aspersions which gave rise to the contempt charges. Id. at 466, 91 S.Ct. at 505. The Supreme Court held that "by reason of the Due Process Clause of the Fourteenth Amendment a defendant in a criminal contempt proceedings should be given a public trial before a judge other than one reviled by the contemnor." Id. at 466, 91 S.Ct. at 505; see also In re Murchison, 349 U.S. 133, 136-38, 75 S.Ct. 623, 625-26, 99 L.Ed. 942 (1955) (a judge who sat as a one man grand jury was a part of the accusatory process, and could not be disinterested in the conviction or acquittal of those accused of contempt). Mayberry reasoned that " '[f]air trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer.' " Mayberry, 400 U.S. at 465, 91 S.Ct. at 505, (quoting Murchison, 349 U.S. at 137, 75 S.Ct. at 625-26). See also Marshall v. Jerrico, Inc., 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980).
 
 
 36
 This circuit, in other contexts, has made similar holdings. In Yamaha Motor Corp., U.S.A. v. Riney, 21 F.3d 793, 797-98 (8th Cir.1994), we reversed a district court finding that one of the six members of the Arkansas Motor Vehicle Commission was not biased. Commissioner Jones was a Harley-Davidson dealer and had a pecuniary interest in eradicating Yamaha from the state of Arkansas. We held that there was "ample evidence in the record that Jones had abdicated his role as an adjudicator and had prejudged the issues before him," and that this bias rendered the Commission incompetent to decide the issues before it. Id. Our opinion cited earlier authority that litigants are entitled to an impartial tribunal whether it consists of one person or twenty. Id.; see also Malek v. Camp, 822 F.2d 812, 817 (8th Cir.1987) (holding that defendant's claim that a member of a prison disciplinary board was personally biased against him because of a pending lawsuit stated a ground for relief under section 1983). Where life is at stake, as opposed to contempt of court, the right to sell motorcycles in a state or prison disciplinary proceedings, there is even more compelling reason to conclude that there has been a substantive due process violation. I reject the State officers' argument that as elected officials they should be shielded from the reach of the due process clause of the United States Constitution.
 
 
 37
 This case is distinguishable from Whitmore v. Gaines, 24 F.3d 1032 (8th Cir.1994). There we held that there was no due process violations where one member of the board conducting clemency proceedings asked questions which suggested that he focused on whether the sentence was illegal rather than the evidence presented in support of the defendant's plea for clemency. Id. at 1034. In Whitmore, the ultimate clemency decision was made by the governor and the alleged violation of the defendant's substantive due process rights were committed by the clemency board. Id. Here the board of pardons made the ultimate clemency decision, which was infected by the substantive due process violation when one of its members, the attorney general, participated in the decision.
 
 
 38
 The Board and warden's brief poses a laundry list of rhetorical questions as to whether certain aspects of the proceeding are shocking. The State's list, however, falls short of enumerating the situation before us, namely that the attorney general actively prosecuted the appeals in Otey's case; sought the death penalty; and then sat on the board deciding whether Otey was to receive clemency. The State has failed to grasp the judicially shocking nature of these conflicting roles.
 
 
 39
 As the Court recently underscored in Herrera, clemency plays a crucial role in the implementation of state capital punishment laws. Herrera, --- U.S. at ---- - ----, 113 S.Ct. at 867-69. Given the crucial role of clemency in the states' capital punishment laws, it is a violation of substantive due process to entrust the pardoning power, even in part, to the state's chief prosecutor, as was done in Otey's case. Executions, like convictions, "cannot be brought about by methods that offend a 'sense of justice.' " See Rochin, 342 U.S. at 173, 72 S.Ct. at 210.
 
 
 40
 For these reasons, I respectfully dissent. I would reverse and remand to the district court to craft an appropriate remedy.
 
 
 
 [1]
 His section 2254 successive and third federal habeas, this time against the Board of Pardons, was dismissed by this court for failure to have subject matter jurisdiction. Otey v. Hopkins, 5 F.3d 1125 (8th Cir.1993), reh'g en banc denied (Jan. 3, 1994), cert. denied, --- U.S. ----, 114 S.Ct. 2768, 129 L.Ed.2d 881 (1994). However, there we said, "We have reviewed Otey's claims and the district court's analysis of those claims on the merits. We do not decide this case on the merits; however, if this case had been properly before us for review, we would affirm the district court." Id. at 1132
 
 
 [2]
 Counsel for Otey, counsel for the victim's family, assistant attorneys general, who appeared as counsel for the state, and various other persons spoke concerning whether Pardons should grant commutation. For security reasons, Otey appeared via videotape. Pardons also had before it a brief from Otey supporting his application, a report from Parole, and correspondence from interested parties in all fifty states and twenty-one foreign countries against the death penalty
 
 
 [3]
 The Honorable Warren K. Urbom, Senior United States District Judge for the District of Nebraska
 
 
 [1]
 I should make clear that the issue is not the propriety or impropriety of the Board of Pardons' decision on the application for grant of clemency, but rather the unconstitutionality of the procedure under which the Board considered Otey's clemency request
 
 
 [2]
 The fact that Otey's counsel withdrew a procedural objection after the attorney general made these statements does not, in my view, constitute a waiver of or otherwise affect Otey's present claims. At the beginning of the hearing, the Governor announced that the proceedings would be informal and that the rules of evidence would not apply. Under these circumstances, Otey's counsel had no obligation to preserve his objection formally
 
 
 [3]
 The assistant attorneys general presented the State's "case" against Otey at the clemency hearing. Attorney General Stenberg's claim to have no personal knowledge of the content of their presentations does not alter their institutional status as his representatives. The attorney general conceded in his deposition that other prosecuting authorities could have presented the position of the state in Otey's case before the Board of Pardons