CONNECTICUT BOARD OF PARDONS ET AL.
*v.* DUMSCHAT ET AL.

No. 79–1997.  Argued February 24, 1981—Decided June 17, 1981

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., *post,* p. 467, and WHITE, J., *post,* p. 467, filed concurring opinions. STEVENS, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post,* p. 468.

*Stephen J. O'Neill,* Assistant Attorney General of Connecticut, argued the cause for petitioners. With him on the brief was *Carl R. Ajello,* Attorney General.

*Stephen Wizner* argued the cause for respondents. With him on the brief were *Dennis E. Curtis* and *John L. Pottenger, Jr.*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented is whether the fact that the Connecticut Board of Pardons has granted approximately three-fourths of the applications for commutation of life sentences creates a constitutional "liberty interest" or "entitlement" in life-term inmates so as to require that Board to explain its reasons for denial of an application for commutation.

## I

In 1964, respondent Dumschat was sentenced to life imprisonment for murder. Under state law, he was not eligible for parole until December 1983.[1] The Connecticut Board of Pardons is empowered to commute the sentences of life inmates by reducing the minimum prison term,[2] and such a commutation accelerates eligibility for parole.[3] The authority of the Board of Pardons derives from Conn. Gen. Stat. § 18-26 (1981), which provides in pertinent part:

> "(a) Jurisdiction over the granting of, and the authority to grant, commutations of punishment or releases, conditioned or absolute, in the case of any person convicted of any offense against the state and commutations from the penalty of death shall be vested in the board of pardons.
>
> "(b) Said board shall have authority to grant pardons, conditioned or absolute, for any offense against the state at any time after the imposition and before or after the service of any sentence."

---

[1] A Connecticut inmate serving a life sentence, imposed before 1971, that does not have a specified minimum term must serve a minimum of 25 years in prison, less a maximum of 5 years' good-time credits, unless the Board of Pardons commutes the sentence. See Conn. Gen. Stat. § 54-125 (1981).

Effective in 1971, the sentencing judge must specify a minimum term, which may be as low as 10 years or as high as 25 years. Conn. Gen. Stat. § 53a-35 (c)(1) (1981).

[2] The Board of Pardons also has the power to grant immediate release in the form of an absolute pardon, but according to the District Court, that power has not been employed in recent history. 432 F. Supp. 1310, 1313 (Conn. 1977).

The District Court noted that by virtue of this statute, Connecticut "stands outside the traditional scheme of clemency through application to the state's chief executive." The Governor of Connecticut has only the power to grant temporary reprieves. *Id.*, at 1312.

[3] Parole determinations are made by the Board of Parole, a separate body. This case does not involve parole procedure; it involves only denials of commutations.

On several occasions prior to the filing of this suit in February 1976, Dumschat applied for a commutation of his sentence. The Board rejected each application without explanation. Dumschat then sued the Board under 42 U. S. C. § 1983, seeking a declaratory judgment that the Board's failure to provide him with a written statement of reasons for denying commutation violated his rights guaranteed by the Due Process Clause of the Fourteenth Amendment.

After hearing testimony from officials of the Board of Pardons and the Board of Parole, the District Court concluded (a) that Dumschat had a constitutionally protected liberty entitlement in the pardon process, and (b) that his due process rights had been violated when the Board of Pardons failed to give "a written statement of reasons and facts relied on" in denying commutation. 432 F. Supp. 1310, 1315 (1977). The court relied chiefly on a showing that "at least 75 percent of all lifers received some favorable action from the pardon board prior to completing their minimum sentences" and that virtually all of the pardoned inmates were promptly paroled.[4] *Id.*, at 1314. In response to postjudgment motions, the District Court allowed other life inmates to intervene, certified the suit as a class action, and heard additional evidence.[5]

---

[4] Of the inmates whose minimum sentences have been commuted by the Board of Pardons, the Board of Parole has paroled approximately 90% during the first year of eligibility, and all have been paroled within a few years. App. 33, 39. The Chairman of the Board of Parole testified that "no more than 10 or 15 per cent" of Connecticut's life inmates serve their 20-year minimum terms. *Id.*, at 31.

[5] On the day that the District Court entered its declaratory judgment, the Board commuted Dumschat's sentence to time served and granted him immediate release. The Board then moved to dismiss the suit as moot. The District Court denied the Board's motion and permitted three other inmates to intervene. Those inmates were serving life terms for murder and had been denied commutation without statements of reasons. Two of them are still serving their sentences. According to respondents, there are approximately 35 persons in the certified class, which consists of all

The court held that all prisoners serving life sentences in Connecticut state prisons have a constitutionally protected expectancy of commutation and therefore that they have a right to a statement of reasons when commutation is not granted. The Court of Appeals affirmed. 593 F. 2d 165 (CA2 1979). A petition for a writ of certiorari was filed, and we vacated and remanded for reconsideration in light of *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1 (1979). 442 U. S. 926 (1979).

On remand, the Court of Appeals reaffirmed its original decision, 618 F. 2d 216 (CA2 1980), stating:

> "In marked contrast [to the Nebraska statute considered in *Greenholtz*], Connecticut's pardons statute contains neither a presumption in favor of pardon nor a list of factors to be considered by the Board of Pardons. Instead, the statute grants the board unfettered discretion in the exercise of its power. The statute offers only the 'mere hope' of pardon; it does not create a legitimate expectation of freedom and therefore does not implicate due process." *Id.,* at 219 (citation omitted).

The Court of Appeals also noted that the District Court's holding that the mere possibility of a pardon creates a constitutionally cognizable liberty interest or entitlement was "no longer tenable" in light of *Greenholtz.* 618 F. 2d, at 221; see 442 U. S., at 8–11. However, the Court of Appeals then proceeded to conclude that "[t]he overwhelming likelihood that Connecticut life inmates will be pardoned and released before they complete their minimum terms gives them a constitutionally protected liberty interest in pardon pro-

"inmates of the State of Connecticut who are currently serving sentences of life imprisonment [without court-imposed minimum terms] and who have been, or who will be, denied pardons during their current terms of incarceration" by the Board of Pardons. App. to Pet. for Cert. 21a; Brief for Petitioners ii; Tr. of Oral Arg. 36; see n. 1, *supra.*

ceedings." 618 F. 2d, at 220. The Court of Appeals also understood our opinion in *Greenholtz* to hold that under the Due Process Clause, a brief statement of reasons is "not only constitutionally sufficient but also constitutionally *necessary*." [6] 618 F. 2d, at 222. On that reading of *Greenholtz,* the case was remanded to the District Court for a determination of "how many years life inmates must serve before the probability of pardon becomes so significant as to give rise to a protected liberty interest." [7]

## II

### A

A state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right. See *Meachum* v. *Fano,* 427 U. S. 215, 226 (1976); *Wolff* v. *McDonnell,* 418 U. S. 539, 557 (1974). Plainly, however, the underlying right must have come into existence before it can trigger due process protection. See, *e. g., Leis* v. *Flynt,* 439 U. S. 438, 442–443 (1979).

In *Greenholtz,* far from spelling out any judicially divined "entitlement," we did no more than apply the unique Nebraska statute. We rejected the claim that a constitutional entitlement to release from a valid prison sentence exists in-

---

[6] In the cited passage of *Greenholtz,* we said: "The Nebraska [statutory] procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more." 442 U. S., at 16.

[7] The Court of Appeals remarked that "[o]nly after this period has elapsed are lifers entitled to due process safeguards in the pardon process." 618 F. 2d, at 221. Because it believed that *every* life inmate who is denied a pardon is constitutionally entitled to a statement of reasons, the District Court did not make such a determination prior to the decision of the Court of Appeals that is now before us. *Id.,* at 220–221; see App. to Pet. for Cert. 25a.

dependently of a right explicitly conferred by the State. Our language in *Greenholtz* leaves no room for doubt:

> "There is *no constitutional or inherent right* of a convicted person to be conditionally released before the expiration of a valid sentence. The natural desire of an individual to be released is indistinguishable from the initial resistance to being confined. But the conviction, with all its procedural safeguards, has extinguished that liberty right: '[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty.'" 442 U. S., at 7 (emphasis supplied; citation omitted).

*Greenholtz* pointedly distinguished parole revocation and probation revocation cases,[8] noting that there is a "critical" difference between denial of a prisoner's request for initial release on parole and revocation of a parolee's conditional liberty. *Id.,* at 9–11, quoting, *inter alia,* Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1296 (1975). Unlike probation, pardon and commutation decisions have not traditionally been the business of courts; as such, they are rarely, if ever, appropriate subjects for judicial review.[9] Cf. *Meachum* v. *Fano, supra,* at 225.

A decision whether to commute a long-term sentence generally depends not simply on objective factfinding, but also on purely subjective evaluations and on predictions of future behavior by those entrusted with the decision. A commutation decision therefore shares some of the characteristics of a decision whether to grant parole. See *Greenholtz,* 442 U. S., at 9–10. Far from supporting an "entitlement," *Greenholtz* therefore compels the conclusion that an inmate has "no constitutional or inherent right" to commutation of his sentence.

---

[8] *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973); *Morrissey* v. *Brewer,* 408 U. S. 471 (1972).

[9] Respondents have not raised any equal protection claim.

Respondents nevertheless contend that the Board's consistent practice of granting commutations to most life inmates is sufficient to create a protectible liberty interest. They argue:

> "[T]he State Board has created an unwritten common law of sentence commutation and parole acceleration for Connecticut life inmates. . . . In effect, there is an unspoken understanding between the State Board and inmates. The terms are simple: If the inmate cooperates with the State, the State will exercise its parole power on the inmate's behalf. Both the State and the inmate recognize those terms. Each expects the other to abide by them." Brief for Respondents 17–18.

This case does not involve parole, and respondents' argument wholly misconceives the nature of a decision by a state to commute the sentence of a convicted felon. The petition in each case is nothing more than an appeal for clemency. See *Schick* v. *Reed*, 419 U. S. 256, 260–266 (1974). In terms of the Due Process Clause, a Connecticut felon's expectation that a lawfully imposed sentence will be commuted or that he will be pardoned is no more substantial than an inmate's expectation, for example, that he will not be transferred to another prison;[10] it is simply a unilateral hope. *Greenholtz, supra,* at 11; see *Leis* v. *Flynt,* 439 U. S., at 443–444. A constitutional entitlement cannot "be created—as if by estoppel—merely because a wholly and *expressly* discretionary state privilege has been granted generously in the past." *Id.,* at 444, n. 5. No matter how frequently a particular form of clemency has been granted, the statistical probabilities standing alone generate no constitutional protections; a contrary conclusion would trivialize the Constitution. The ground for a constitutional claim, if any, must be found in statutes or other rules defining the obligations of the authority charged with exercising clemency.

---

[10] See *Meachum* v. *Fano,* 427 U. S. 215, 228 (1976).

## B

The Court of Appeals correctly recognized that Connecticut has conferred "unfettered discretion" on its Board of Pardons, but—paradoxically—then proceeded to fetter the Board with a halter of constitutional "entitlement." The statute imposes no limit on what procedure is to be followed, what evidence may be considered, or what criteria are to be applied by the Board. Respondents challenge the Board's procedure precisely because of "the absence of any apparent standards." Brief for Respondents 28. We agree that there are no explicit standards by way of statute, regulation, or otherwise.

This contrasts dramatically with the Nebraska statutory procedures in *Greenholtz,* which expressly mandated that the Nebraska Board of Parole "shall" order the inmate's release "unless" it decided that one of four specified reasons for denial was applicable. 442 U. S., at 11. The Connecticut commutation statute, having no definitions, no criteria, and no mandated "shalls," creates no analogous duty or constitutional entitlement.

It is clear that the requirement for articulating reasons for denial of parole in *Greenholtz* derived from unique mandates of the Nebraska statutes. Thus, although we noted that under the terms of the Nebraska statute, the inmates' expectancy of parole release "is entitled to some measure of constitutional protection," we emphasized that

> "this statute has unique structure and language and thus whether any other state statute provides a protectible entitlement must be decided on a case-by-case basis." *Id.,* at 12.

Moreover, from the standpoint of a reasons requirement, there is a vast difference between a denial of parole—particularly on the facts of *Greenholtz*—and a state's refusal to commute a lawful sentence. When Nebraska statutes directed that inmates who are eligible for parole "shall" be released "unless"

a certain finding has been made, the statutes created a right. By contrast, the mere existence of a power to commute a lawfully imposed sentence, and the granting of commutations to many petitioners, create no right or "entitlement." A state cannot be required to explain its reasons for a decision when it is not required to act on prescribed grounds.

We hold that the power vested in the Connecticut Board of Pardons to commute sentences conferred no rights on respondents beyond the right to seek commutation.

*Reversed.*

JUSTICE BRENNAN, concurring.

I join the Court's opinion. Although respondents have demonstrated a statistical likelihood of obtaining the relief they request, that is not enough to create a protectible liberty interest. Rather, respondents must also show—by reference to statute, regulation, administrative practice, contractual arrangement or other mutual understanding—that particularized standards or criteria guide the State's decisionmakers. See *Leis* v. *Flynt,* 439 U. S. 438, 442 (1979); *Perry* v. *Sindermann,* 408 U. S. 593, 601 (1972); *Board of Regents* v. *Roth,* 408 U. S. 564, 577 (1972). The *structure* of the State's decisionmaking process is thus as significant as the likely *result* of that process. Respondents have not shown that the Board is required to base its decisions on objective and defined criteria. As in *Meachum* v. *Fano,* 427 U. S. 215, 228 (1976), the decisionmaker can deny the requested relief for any constitutionally permissible reason or for no reason at all. Accordingly, I agree that respondents have no protectible liberty interest in a pardon.

JUSTICE WHITE, concurring.

I join the Court's opinion and write separately only to observe that neither *Wolff* v. *McDonnell,* 418 U. S. 539 (1974), nor *Meachum* v. *Fano,* 427 U. S. 215 (1976), suggested that state law is the only source of a prisoner's liberty worthy of

federal constitutional protection. The opinion in *Wolff* v. *McDonnell* pointed out that although a prisoner's "rights may be diminished by the needs and exigencies of the institutional environment, [he] is not wholly stripped of constitutional protections when he is imprisoned for crime. . . . [He] may not be deprived of life, liberty or property without due process of law." 418 U. S., at 555–556. The issue in the case was the deprivation of the right to good-time credits, a right which was not guaranteed by the Federal Constitution but was a creation of state law. *Wolff* held that even such a liberty interest rooted in state law was entitled to constitutional protection.

*Meachum* v. *Fano* also pointed out that "the convicted felon does not forfeit all constitutional protections by reason of his conviction and confinement in prison. He retains a variety of important rights that the courts must be alert to protect." 427 U. S., at 225. The Court went on to hold that a state prisoner has no federal constitutional right protecting him against administrative transfers to another state prison. Neither did state law purport to create a liberty interest entitled to protection under the Fourteenth Amendment. Of course, JUSTICE STEVENS was in dissent in that case; but even there he recognized that the Court's opinion first addressed whether the right asserted was one of the liberty interests retained by convicted felons. We decided that it was not; he thought that it was. But neither *Wolff* nor *Meachum* is fairly characterized as suggesting that all liberty interests entitled to constitutional protection must be found in state law.

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

"Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 18 (opinion of POWELL, J.).

The liberty that is worthy of constitutional protection is not merely "a statutory creation of the State," *Wolff* v. *McDonnell*, 418 U. S. 539, 558. Surely the Court stumbles when it states that liberty "must be found in statutes or other rules defining the obligations of the authority charged with exercising clemency," *ante*, at 465, or when it implies that liberty has "its roots in state law," *Meachum* v. *Fano*, 427 U. S. 215, 226.

To some of us, it is "self-evident" that individual liberty has far deeper roots.[1] Moreover, the deprivation of liberty that follows conviction of a criminal offense is not total; the individual possesses a residuum of constitutionally protected liberty even while he is in the legal custody of the State.[2] The question this case presents is not whether these respondents are mere slaves, wholly divested of any constitutionally protected interest in liberty; rather, the question is whether the decision by the Connecticut Board of Pardons refusing to commute their life sentences constitutes a deprivation of liberty entitling respondents to the protection of the Due Process Clause.

---

[1] "It is self-evident that all individuals possess a liberty interest in being free from physical restraint." *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 23 (MARSHALL, J., dissenting).

"If man were a creature of the State, the analysis would be correct. But neither the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen. The relevant state laws either create property rights, or they curtail the freedom of the citizen who must live in an ordered society. Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. But it is not the source of liberty, and surely not the exclusive source.

"I had thought it self-evident that all men were endowed by their Creator with liberty as one of the cardinal unalienable rights. It is that basic freedom which the Due Process Clause protects, rather than the particular rights or privileges conferred by specific laws or regulations." *Meachum* v. *Fano*, 427 U. S. 215, 230 (STEVENS, J., dissenting).

[2] See *Meachum* v. *Fano*, *supra*, at 231–233.

The facile answer to that question is that the distinction between a refusal to grant freedom on the one hand and the imposition of a sentence or the revocation of a parole on the other forms the basis for a determination whether due process is implicated. Only the imposition of sentence or revocation of parole is obviously a deprivation of liberty. But in practice, as JUSTICE POWELL has explained, that distinction is far less satisfactory than it first appears.[3] In my judgment, it provides an insufficient answer to the question presented by this case because the distinction does not correctly evaluate the character of the deprivation of liberty that occurs when a person is convicted of a crime.

If the conviction were effective to terminate the defendant's liberty, he would thereafter retain no constitutional right to procedural safeguards against arbitrary action. The process of sentencing, parole release, parole revocation, and ultimate discharge could all be totally arbitrary. But no State asserts such total control over the convicted offender, and this Court has unequivocally held that the Constitution affords protection at different stages of the postconviction

---

[3] "The Court today, however, concludes that parole release and parole revocation 'are quite different,' because 'there is a . . . difference between losing what one has and not getting what one wants,' *ante*, at 9, 10. I am unpersuaded that this difference, if indeed it exists at all, is as significant as the Court implies. Release on parole marks the first time when the severe restrictions imposed on a prisoner's liberty by the prison regimen may be lifted, and his behavior in prison often is molded by his hope and expectation of securing parole at the earliest time permitted by law. Thus, the parole-release determination may be as important to the prisoner as some later, and generally unanticipated, parole-revocation decision. Moreover, whatever difference there may be in the subjective reactions of prisoners and parolees to release and revocation determinations is not dispositive. From the day that he is sentenced in a State with a parole system, a prisoner justifiably expects release on parole when he meets the standards of eligibility applicable within that system. This is true even if denial of release will be a less severe disappointment than revocation of parole once granted." *Greenholtz* v. *Nebraska Penal Inmates, supra,* at 19–20 (opinion of POWELL, J.).

process.[4]  The basic reason the constitutional protection applies at these stages is that liberty itself survives to some extent and its deprivation is a continuous process rather than an isolated event.

This case involves the State of Connecticut's process for determining when a relatively small group of serious offenders will be released from custody. Routinely that process includes three determinations: the judge imposes a life sentence; the Board of Pardons in due course commutes that sentence; and finally the Board of Parole discharges the prisoner from custody.  Each of these three decisions is a regular and critical component of the decisionmaking process employed by the State of Connecticut to determine the magnitude of its deprivation of the prisoner's liberty.[5]  In my opinion the Due Process Clause applies to each step and denies the State the power to act arbitrarily.[6]

---

[4] Thus the Court has held that the Due Process Clause protects the prisoner at the sentencing stage, *Mempa* v. *Rhay,* 389 U. S. 128, in probation revocation proceedings, *Gagnon* v. *Scarpelli,* 411 U. S. 778, and in parole revocation proceedings, *Morrissey* v. *Brewer,* 408 U. S. 471.  Moreover, the Constitution has been applied to other issues affecting prisoners. See, *e. g., Bounds* v. *Smith,* 430 U. S. 817 (right to assistance in the filing of legal papers); *Pell* v. *Procunier,* 417 U. S. 817, 822 (First Amendment rights); *Cruz* v. *Beto,* 405 U. S. 319 (right to practice religious faith); *Wilwording* v. *Swenson,* 404 U. S. 249 (right to file petition for writ of habeas corpus); *Cooper* v. *Pate,* 378 U. S. 546; (right to purchase religious materials); *Ex parte Hull,* 312 U. S. 546 (right to petition federal court for writ of habeas corpus).  Cf. *Weems* v. *United States,* 217 U. S. 349 (sentence may violate Eighth Amendment).

[5] As the Court recognizes, *ante,* at 461, at least 75% of all life inmates receive some favorable action from the Board of Pardons.  The Board of Parole paroles approximately 90% of these inmates during the first year after the Board of Pardons commutes their minimum sentences, and all are paroled within a few years.  *Ante,* at 461, n. 4.

[6] The fact that the petitioner agency is given the title "Board of Pardons" does not, of course, make its work the equivalent of the exercise by a chief executive of the occasional totally discretionary power to grant pardons in isolated cases.  As the record in this case makes clear, the petitioner com-

Whether the refusal to provide the inmates with a statement of reasons is a procedural shortcoming of constitutional magnitude is, admittedly, fairly debatable. Judges often decide difficult and important cases without explaining their reasons, and I would not suggest that they thereby commit constitutional error. But the ordinary litigant has other substantial procedural safeguards against arbitrary decision-making in the courtroom. The prison inmate has few such protections. Indeed, as in this case, often he is not even afforded the protection of written standards to govern the exercise of the powers of the Board of Pardons. His protection is somewhat analogous to that of the litigant in the earliest days of our common-law history. The judges then were guided by few written laws, but developed a meaningful set of rules by the process of case-by-case adjudication. Their explanations of why they decided cases as they did provided guideposts for future decisions and an assurance to litigants that like cases were being decided in a similar way. Many of us believe that those statements of reasons provided a better guarantee of justice than could possibly have been described in a code written in sufficient detail to be fit for Napoleon.

As JUSTICE MARSHALL has pointed out, "the obligation to justify a decision publicly would provide the assurance, critical to the appearance of fairness that the Board's decision is not capricious," see *Greenholtz*, 442 U. S., at 40 (dissenting opinion). I therefore believe the Court of Appeals correctly concluded that in this context a brief statement of reasons is an essential element of the process that is due these respondents.

Accordingly, I respectfully dissent.

---

mutes sentences with roughly the same frequency that parole boards make parole release determinations.