Joseph **HENNESSEY**, Petitioner,

v.

**PENNSYLVANIA BOARD OF PARDONS**, Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 5, 1994.

Decided Feb. 22, 1995.

---

Leonard N. Sosnov, for petitioner.

Amy L. Putnam, Deputy Gen. Counsel, for respondent.

Before COLINS, President Judge, and DOYLE, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN and NEWMAN, JJ.

COLINS, President Judge.

Petitioner Joseph Hennessey (Hennessey) brings this motion for summary relief [1] under Pa.R.A.P. 1532(b) against the Pennsylvania Board of Pardons (Board) on the basis of his pleading that the Board denied him a full, public hearing on his application for clemen-

cy in violation of his rights under Article IV, Section 9 of the Pennsylvania Constitution. Hennessey seeks a declaration of his rights and an order compelling the Board to hold a hearing on his application. Relief is denied.

Since 1975, Hennessey has been serving a life sentence on a conviction of first-degree murder. In November 1992, after serving seventeen years, Hennessey applied to the Board for commutation of his sentence. The Board voted on Hennessey's application in open session on May 24, 1992. The votes were posted outside the hearing room and outside the Board's office. Because no affirmative votes were cast in favor of Hennessey's application, the Board did not proceed to a hearing. On June 23, 1993, Hennessey filed a petition for review in the nature of a complaint in equity addressed to this Court's original jurisdiction.

In its answer to Hennessey's amended petition, the Board admitted the facts surrounding the May 24 vote and denial of a hearing and asserted as new matter that the Board is not amenable to suit under 42 U.S.C. § 1983; that clemency is a discretionary prerogative of the governor; that the Board is immune from suit; and that Hennessey failed to state a cause of action. On June 30, 1994, Hennessey filed the application for summary relief currently at issue.

In ruling on an application for summary relief, the court must view the evidence of record in the light most favorable to the nonmoving party and enter judgment only if there are no genuine issues as to any material facts and the right to judgment is clear as a matter of law. *Central Dauphin School District v. Commonwealth,* 143 Pa.Commonwealth Ct. 374, 598 A.2d 1364 (1991), *petition for allowance of appeal granted on other grounds sub nom. Central Dauphin School District v. Pa. Manufacturers' Association Insurance Co.,* 537 Pa. 628, 642 A.2d 482 (1994).

The issue before this Court is whether Article IV, Section 9 of the Pennsylvania Constitution requires a public hearing on all applications for clemency. Hennessey as-

1. The Board has not filed a cross-motion for summary relief.

serts that the Constitution's language clearly requires a hearing in all cases and that the Board's present practice of voting initially to determine whether to hold a hearing violates that mandate. The Board urges dismissal of this petition because, it asserts, Hennessey has no right to a hearing if the Board is not recommending his application for commutation to the governor. The Board also asserts that because clemency is a wholly discretionary power of the executive, Hennessey has no right to a hearing and the matter of his petition is nonjusticiable.[2]

Under the Pennsylvania Constitution, the power to pardon rests exclusively with the governor. *Commonwealth ex rel. Banks v. Cain*, 345 Pa. 581, 28 A.2d 897 (1942). The constitutionally created Board of Pardons reviews all applications for clemency, and no pardon or commutation can be granted without the Board's recommendation after a full hearing in open session with public notice. Pa. Const. art. IV, § 9(a). This provision does not guarantee a hearing to all applicants; it guarantees a full, public hearing only when the Board recommends clemency and before the governor acts on that recommendation.

Hennessey has no state or federal right to a hearing on his application for clemency. The executive power to pardon confers no constitutional or inherent right in a prisoner beyond the right to seek a pardon or commutation. *Greenholtz v. Inmates of Nebraska Penal and Correctional Institution*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981). A prisoner has no liberty interest in the possibility of commutation of his sentence. *McCrery v. Mark*, 823 F.Supp. 288 (E.D.Pa.1993).

In *Greenholtz* and *Dumschat*, the U.S. Supreme Court recognized that a state could grant prisoners a liberty interest in the prospect of release. In both cases the Court emphasized that a constitutional entitlement is not created merely because a wholly discretionary state privilege has been granted generously in the past. "The ground for a constitutional claim, if any, must be found in statutes or other rules defining the obligation of the authority charged with exercising clemency." *Dumschat*, 452 U.S. at 465, 101 S.Ct. at 2465. In *Greenholtz* the Court found a liberty interest because the Nebraska statutory procedures expressly mandated that its Board of Pardons "shall" order the prisoner's release "unless" one of the specified reasons for denial applied. The Connecticut statute at issue in *Dumschat* created no constitutional entitlement because it gave the Board of Pardons absolute discretion, "having no definitions, no criteria, and no mandated 'shalls.'" *Id.* at 466, 101 S.Ct. at 2465.

Article IV, Section 9 of the Pennsylvania Constitution creates no entitlement to a pardon or commutation and no interest in the prospect of release. The Pennsylvania statute grants the pardon power exclusively to the governor upon recommendation of the Board after a public hearing. The Board is under no statutory mandate except that it vote in public, that it make its records available for public inspection, and when it does recommend in favor of the applicant, that it do so only after a public hearing.

Provisions in Article IV, Section 9 that require the Board to conduct public hearings and votes are designed to protect the public; they do not confer any rights on prisoners. In *The Morning Call, Inc. v. Commonwealth*, 135 Pa.Commonwealth Ct. 384, 580 A.2d 1183 (1990), this Court examined the history of those provisions.

> [i]t is the province of the Judiciary to determine whether the Constitution or laws of the Commonwealth require or prohibit the performance of certain acts. That our role may not extend to the ultimate carrying out of those acts does not reflect upon our capacity to determine the requirements of the law.

*Thornburgh v. Lewis*, 504 Pa. 206, 212, 470 A.2d 952, 955 (1983).

---

**2.** This argument is without merit. Action by the Board in no way comes under the aegis of the courts, and courts cannot impinge upon the exclusive jurisdiction of the executive branch in showing clemency. *Commonwealth ex rel. Cater v. Myers*, 412 Pa. 67, 194 A.2d 185 (1963), *certiorari denied*, 376 U.S. 933, 84 S.Ct. 704, 11 L.Ed.2d 653 (1964). We note, however, that what Hennessey asks is that we determine what the Constitution requires, and

The amendments to Article 4, Section 9 of the Constitution were made to ensure public access to the proceedings and records of the Board. The 1874 amendment required that the action of the Board be accomplished in open session *including voting* on matters that came before the Board. The 1967 amendment was added to rectify ... a shortcoming in the process by requiring that the Board make its records open to the public.

135 Pa.Commonwealth Ct. at 389, 580 A.2d at 1185 (emphasis in original). The amendments created rights in members of the public, both those who attend the hearing and those who do not attend. The amendments created no rights in favor of prisoners.

Section 909 of The Administrative Code of 1929[3] authorizes the Board to adopt rules and regulations for its operation. In 1986 the Board began its current procedure of voting on applications prior to a public hearing. "[All a]pplications filed, except for those in capital—death—cases, are subject to review by the Board. An affirmative vote of two members ... is required before a hearing is granted." 37 Pa.Code § 81.31. Since we have concluded that Hennessey is not entitled to a hearing, the Board's adoption of procedures that reduce the likelihood of an applicant getting a hearing does not impinge on any right or entitlement to a hearing.

In view of the foregoing, we conclude that Hennessey's right to judgment is not clear, and his petition for summary relief is denied.

## ORDER

AND NOW, this 22nd day of February, 1995, petitioner's application for summary relief in the above-captioned matter is denied.

**3.** Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. § 299.

**1.** Hennessey asks only that this court permit his representative fifteen minutes to address the Pardons Board concerning the merits of his application. Under current regulations, an incarcerated applicant, like Hennessey, may not appear in person before the Pardons Board but, instead, must designate a representative. 37 Pa.Code § 81.81. At the hearing, the Pardons Board allows the representative only fifteen minutes for the entire presentation on the merits of the application. 37 Pa.Code § 81.92.

FRIEDMAN, Judge, dissenting.

I respectfully dissent. Because I believe that Article IV, Section 9 of the Pennsylvania Constitution requires a public hearing on *all* applications for clemency, I would grant the motion for summary relief filed by Petitioner Joseph Hennessey and compel the Pennsylvania Board of Pardons (Pardons Board) to hold a public hearing[1] on his application for commutation to life on parole.[2]

In reaching a contrary result, the Majority asserts that Article IV, Section 9 creates rights only in members of the public, not in prisoners (Majority Op. at 220), and that Hennessey has no other federal or state right to a hearing on his application (Majority Op. at 220). Thus, the Majority concludes that the constitutional provision guarantees a full and public hearing only when the Pardons Board *recommends clemency* to the Governor. (Majority Op. at 220.) I cannot agree.

First, unlike the Majority, I believe that Article IV, Section 9, when properly understood in light of its constitutional history and subsequent case law, creates rights in prisoners, as well as in members of the public; indeed, the framers of Pennsylvania's Constitution never intended that the Pardons Board review *any* application without a full and public hearing.

Second, I believe that, as a matter of public policy, the Pardons Board should hold a full and public hearing on every application in order to provide each applicant an opportunity to correct erroneous information. In so doing, the Pardons Board would further Pennsylvania's interest in prisoner rehabilita-

**2.** Hennessey's application to commute his life *sentence is an application for life on parole. See* Commonwealth of Pennsylvania, Board of Pardons, Clemency in Pennsylvania 5 (1994) [hereinafter Clemency in Pennsylvania]. As such, it is *not* an application for a full pardon but rather an application for a conditional, or revocable, pardon. *See* Timothy P. Wile, Pennsylvania Law of Probation and Parole § 5.1 (1994) [hereinafter Wile]; *see also Commonwealth v. J.C.K.,* —— Pa.Superior Ct. ——, 651 A.2d 144 (1994) (conditional gubernatorial pardon precludes expungement of entire criminal record).

tion while, at the same time, causing no danger to society.

Third, I believe that the presence of a commutation system in Pennsylvania is sufficient to create in prisoners a liberty interest in the decision to grant or deny life on parole; i.e., Hennessey has a liberty interest in not being denied life on parole for arbitrary or constitutionally impermissible reasons. Here, Hennessey alleges that the Pardons Board's decision to deny his application for life on parole was based on false information provided by the Department of Corrections in its report to the Pardons Board.[3] If Hennessey's allegations are true, then the Pardons Board's decision has no rational basis and, therefore, is arbitrary.

Finally, I believe that the text of Article IV, Section 9 establishes a gubernatorial duty to review every meritorious application for commutation; however, if the Pardons Board denies an otherwise meritorious application because of false information, then the Pardons Board has prevented the Governor from fulfilling that constitutional obligation. Because the Pardons Board cannot possibly determine which prisoners have truly earned a commutation if the record contains false

information, the Pardons Board must hold a full and public hearing on every application.

Article IV, Section 9(a) of the Pennsylvania Constitution states in pertinent part:

(a) In all criminal cases except impeachment, the Governor shall have power ... to grant reprieves, commutation of sentences and pardons; but no pardon shall be granted, nor sentence commuted, except on the recommendation ... of the Board of Pardons, after full hearing in open session. ...

Pa. Const. art. IV, § 9(a). As a general rule, when analyzing a provision of the Pennsylvania Constitution, courts should consider: (1) the history of the provision, including Pennsylvania case law; (2) policy considerations; (3) relevant case law from other states; and (4) the text of the Pennsylvania constitutional provision. *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991).

## I. History and Case Law

### A. History

Between the time Article IV, Section 9 was adopted in 1874[4] until May 17, 1986, the Pardons Board held a full and public hearing on *every* application for clemency.[5] The con-

---

**3.** The Department of Corrections recommended that the Pardons Board deny Hennessey's application; however, Hennessey claims that the recommendation was based upon a work report containing incorrect statements. Hennessey further alleges that other favorable information was not considered. (Petition for Review, para. 3.)

**4.** The Constitutional Convention convened in Harrisburg on November 12, 1872, but the delegates adjourned in January of 1873 to move the debates to Philadelphia where, on November 3, 1873, the convention completed its work. The following month, at a special election, the people of Pennsylvania ratified the new Constitution, which became effective on January 1, 1874. *See* Robert E. Woodside, Pennsylvania Constitutional Law 577 (1985).

**5.** Prior to May 17, 1986, 37 Pa.Code § 81.31 stated as follows:

Applications filed shall be subject to review and investigation prior to hearing. The applicant or representative will be notified of a tentative hearing date and location. After the application and all investigations are complete, *the case will be heard.*

37 Pa.Code § 81.31 (1985) (emphasis added). The current regulation states:

Applications filed, except for those in capital-death-cases, are subject to review by the Board. *An affirmative vote of two members of the Board is required before a hearing is granted.* The applicant or representative will be notified of the decision of the Board. Capital applications will receive a hearing before the Board.

37 Pa.Code § 81.31 (emphasis added).

The Pardons Board sought the amendment to the regulation because "[a]mong the applications filed there are a certain number having little or no merit." 15 Pa.B. 4499 (1985). However, the constitution did not change. Indeed, the Pardons Board's interest in saving time and energy is trifling compared to the fundamental constitutional interests at stake here.

The Pardons Board's failure to hold a hearing on each application: (1) interferes with the Governor's constitutional power to grant commutations; i.e., when the Pardons Board, based on incorrect information, denies what may be an otherwise meritorious application; (2) deprives the applicant of any opportunity to be heard in support of his liberty interest; and (3) prevents anyone from correcting mistaken information or adding other relevant information to assist the Pardons Board in making a fair and proper recommendation to the Governor. Certainly, the

stitutional history of Article IV, Section 9 and subsequent Pennsylvania case law demonstrate that the Pardons Board's early practice, which continued unabated for 112 years, was precisely what the framers envisioned when they adopted the provision. The Majority suggests by its holding that the Pardons Board's earliest procedures were, in fact, contrary to the intent of the framers of Article IV, Section 9. I cannot agree.

The Majority asserts that the framers were motivated *solely* by concern for the public safety; i.e., the framers feared that the Governor would succumb to improper influence and release unrehabilitated criminals into society. This, however, is an oversimplification of the historical record which, contrary to the Majority view, reveals that the framers of Article IV, Section 9 were motivated not only by concern for public safety, but also by concern for prisoner reha-

bilitation [6] and the proper release of persons who present meritorious clemency applications.[7]

The framers had to face the fact that the Governor, the sole dispenser of executive grace, was neither omniscient (able to ascertain when an application contained erroneous information) [8] nor omnipotent (able to withstand outside pressures) [9] but, instead, was fallible. The framers, therefore, established the Pardons Board to ensure that every clemency application was heard (to ascertain the truth) and reviewed on its merits (disregarding public sentiment and other pressures).[10] Here, the Pardons Board never held a public hearing and, thus, never determined whether its investigative materials contained erroneous statements. As a result, no one knows whether the Pardons Board based its decision on the merits of Hennes-

---

burden on the Pardons Board is inconsequential when balanced against these fundamental constitutional concerns.

6. One of the framers, former Governor Andrew Gregg Curtin, Governor of Pennsylvania from 1861 to 1867, stated that "[t]he committee in considering this section of the article had . . . in view the protection of the pardoning power. . . ." 2 Debates of the Convention to Amend the Constitution of Pennsylvania 352 [hereinafter Debates]. Mr. Curtin asserted that, in spite of the abuses,

> [t]here is a period in the history of almost every criminal confined in your prisons when a proper exercise of the pardoning power may restore him to usefulness, and give him a future life honored and respected; when, if he remained within the prison walls, he turns out a hardened villain, abandoned by society, and ready for the commission of new crimes.

2 Debates at 353.

7. The framers recognized that the Governor sometimes failed to exercise the pardoning power, even when warranted, because of factors unrelated to the merits of an application.

> [I]f there be any abuse of the pardoning power it consists in the fact of its non-exercise. . . . [I]t has been, perhaps, from a fear of public clamor . . . abused in the fact that it has not been exercised in many cases where it should have been. It has been withheld, perhaps, *in meritorious cases*, because the Governor desired, as far as practicable, to avoid public abuse which was generally brought upon him for the exercise of this power.

2 Debates at 376 (emphasis added).
We realize that a pardon is conceptually different from a commutation; however, for our pur-

poses here, they are the same. We also note that the idea of a conditional pardon existed long before the Constitutional Convention of 1873. *See Flavell's Case*, 8 Watts & Serg. 197 (1844) (Governor has power to grant pardons with a binding condition subsequent, on breach of which the pardon would become null, and the original sentence be carried into effect).

8. In one instance described by the framers, false information played a role in the granting of a pardon:

> [T]he evidence that the Executive was imposed upon is found on the face of the pardon itself, because the man is there described as having been a soldier, and he is now but twenty-three years of age, and as having a family, while in reality he is a single man.

2 Debates at 352.

9. The Governor was pressured by the public, by relatives of prisoners and by political friends. *See* 2 Debates at 376; *see also* 5 Debates at 215, 225.

10. Mr. Curtin explained to the framers:

> [I]t is the design of the section to break that pressure upon the Executive, to put between him and this constant pressure . . . some intermediate tribunal *where the application can be heard, [and] where the hearing can be in public* and upon due notice, as is provided for in this section; that is, that before the pressure comes to the Executive the party shall be heard and the reasons for the pardon and the objections made to it shall be filtered through this intermediate board.

5 Debates at 227–28 (emphasis added).

sey's application or on unchallenged false information.

The historical record shows that the framers anticipated this scenario and attempted to prevent it by requiring a full and public hearing on every application. Indeed, the framers did not trust the Pardons Board to remain immune to outside pressures; they realized that, without any oversight, the Pardons Board would be as susceptible as the Governor had been to improper influence.[11] Thus, in order to hold the Pardons Board accountable for its actions, the framers required that the Pardons Board conduct its business in public.[12] The framers never contemplated that the Pardons Board would review any application without the benefit of a full and public hearing and, indeed, rejected such an idea.

> Everything that appertains to a subject where there has been so much darkness and fraud, should now have thrown upon and around it a flood light, and everything connected with it in the future should be open and above board, so that a fair knowledge of the subject *pro* and *con* can come before the public.

7 Debates at 450 (emphasis in original). Here, the Pardons Board turned off the flood light and denied the public an opportunity to gain a *fair* knowledge of Hennessey.[13]

In sum, the framers, through Article IV, Section 9, sought to transform the pardoning process as much as possible from a frequently abused system of executive grace (where the Governor alone could mete out mercy and where a grant of clemency was an act of absolute discretion, subject only to the con-

science of the Governor) to a system of merit (where the Pardons Board, subject to public scrutiny, openly and objectively evaluates each application to ensure that its decision is fair to the applicant and that clemency, if granted, is earned). The Pardons Board's current practice is contrary to this constitutional scheme because it permits the Pardons Board to operate without regard to merit and without accountability. Unless there is a public hearing, the decision of the Pardons Board here, even if wrong, will stand.

### B. Case Law

Both the Supreme Court of Pennsylvania and this court have recognized the propriety of a full and public hearing on every application for clemency. In a 1963 case, our Supreme Court noted that

> [i]n the 89 years in which the Board has functioned, a full hearing of *all* petitions has been held after due public notice and in open session....

*Commonwealth ex rel. Cater v. Myers*, 412 Pa. 67, 71, 194 A.2d 185, 187–88 (1963), *cert. denied sub nom Cater v. Pennsylvania*, 376 U.S. 933, 84 S.Ct. 704, 11 L.Ed.2d 653 (1964) (emphasis added). More recently, this court reviewed the historical development of Article IV, Section 9 and reaffirmed that by its adoption in 1874, "the electorate mandated that actions by the Board relating to pardons or commutations of sentences were now to be conducted in public." *The Morning Call, Inc. v. Commonwealth, Board of Pardons*, 135 Pa.Commonwealth Ct. 384, 388, 580 A.2d

---

11. Speaking in favor of a "full hearing in open session," Mr. Henry W. Palmer warned of the possible corruption of Pardons Board members:

> Members of the pardon board would, from time to time, need favors from each other in the pardon business..... Should we not guard against such abuse by adopting a proviso requiring an open hearing before the board....

2 Debates at 358.

12. The framers sought to "hold [the Pardons Board] accountable for *any* improper action they may take...." and regarded it "as a matter of great consequence that the proceedings shall be not only public, but that there shall be a record...." 5 Debates at 226 (emphasis added).

13. The fifteen minute presentation at the hearing is not insignificant and, at times, can be persuasive. We know from recent testimony before the Pennsylvania Senate Judiciary Committee that, on at least one occasion, a prisoner serving a life sentence received only the minimum two votes required to get a hearing but, after the hearing, the Pardons Board voted 4–1 to recommend clemency. *Oversight Hearing on the Board of Pardons Before the Senate Judiciary Committee*, Session of 1994, 178th of the General Assembly (testimony of Diana Hollis) [hereinafter *Oversight Hearing*].

1183, 1185 (1990).[14] Here, the Pardons Board took action on Hennessey's application but, contrary to Pennsylvania case law, the action was not conducted in public.

## II. Policy Considerations

The Majority opinion rests solely on a policy of protecting the public from the unbridled exercise of executive discretion in releasing "dangerous convicts" into society.[15] However, the Majority opinion ignores the mandate of what is commonly called the Parole Act, Act of August 6, 1941, P.L. 861, *as amended,* 61 P.S. §§ 331.1–331.34, which

states that society's interest in that regard is to be balanced against the best interests of the convict, not the other way around. The Parole Act recognizes that rehabilitation of the prisoner and the safety of the community are not at odds.[16]

As a threshold matter, it is important to realize that the Pardons Board, to the extent that it considers applications to commute life sentences to life on parole, is part of Pennsylvania's uniform and exclusive system of parole.[17] As such, the Pardons Board must use applicable standards for parole eligibility in deciding whether to recommend or deny

**14.** By further amendment in 1967, the Pardons Board was required to keep records of its actions [at the public hearing] open for public inspection. *The Morning Call, Inc.*

**15.** There are other policy considerations that are not considered by the Majority, several of which deserve mention here: the cost of confining a prisoner for life, prison overcrowding, and the danger of riot by prisoners who feel abandoned by society.

**16.** When a parole system is successful in its rehabilitative efforts, the public, as well as the prisoner, benefits. In *Morrissey v. Brewer,* 408 U.S. 471, 477, 92 S.Ct. 2593, 2598, 33 L.Ed.2d 484 (1972) (emphasis added), the U.S. Supreme Court made the following comments about the function of parole in society, which are equally applicable here to commutation of a life sentence to life on parole:

> [P]arole is an established variation on imprisonment of convicted criminals. Its purpose is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed. *It also serves to alleviate the costs to society of keeping an individual in prison.*

Thus, "[s]ociety has a stake in whatever may be the chance of restoring [the parolee] to normal and useful life within the law." *Morrissey,* 408 U.S. at 484, 92 S.Ct. at 2601.

**17.** Section 1 of the Parole Act, 61 P.S. § 331.1, states: "[I]t is the intent of this act to create a uniform and exclusive system for the administration of parole in this Commonwealth."

The dual roles of the Pardons Board and the Parole Board within this uniform and exclusive system of parole are defined in section 21 of the Parole Act, 61 P.S. § 331.21 (emphasis added), which states in pertinent part:

> The [parole] board is hereby authorized to release on parole any convict ..., except convicts condemned to death or serving life imprisonment, *whenever in its opinion the best interests of the convict justify or require his being paroled* and it does not appear that the

interests of the Commonwealth will be injured thereby. The power to parole [may be exercised after] ... the expiration of the minimum term of imprisonment fixed ... by the Pardon Board in a sentence which has been reduced by commutation: Provided, however, That if the Board of Parole refuse to parole the prisoner at the expiration of any minimum term fixed by the Pardon Board, it shall ... transmit to the Pardon Board a written statement of the reasons for the refusal to parole.... Thereafter, the Pardon Board may either accept the action of the Board of Parole, or order the immediate release of the prisoner on parole, under the supervision of the Board of Parole.

Thus, the General Assembly has divided the parole power between the Parole Board and the Pardons Board. The Parole Board has power to parole all convicts *except* those serving capital or life sentences; the Pardons Board, through commutation, has exclusive power to parole convicts serving life sentences.

Commutation means "the change of a punishment to one which is less severe." Black's Law Dictionary 254 (1979). When the Pardons Board commutes a life sentence to life on parole, it alters the original sentence by establishing a minimum term.

> [U]nder Pennsylvania law, the sentence imposed for a criminal offense is the maximum term. The minimum term merely sets the date prior to which a prisoner may not be paroled.... The significance of a parolee's minimum term is that it establishes a parole eligibility date.

*Krantz v. Pennsylvania Board of Probation and Parole,* 86 Pa.Commonwealth Ct. 38, 42, 483 A.2d 1044, 1047 (1984). A life sentence, because it is for life, has no minimum term; it is only when the Pardons Board, which has exclusive jurisdiction over life sentences, commutes the life sentence that a lifer achieves a minimum parole date for eligibility.

an application for life on parole.[18] When a prisoner serving a life sentence meets those standards, that prisoner justifiably expects that the Pardons Board's decision will be fair and according to law.[19] In this way, Pennsylvania's commutation/parole system provides an incentive to prisoners to reform themselves and strive to earn an opportunity to be at liberty in society.[20]

Here, however, if the investigative materials submitted to the Pardons Board by the Department of Corrections contained false information about Hennessey, then the Pardons Board's denial of his application was unfair.[21] If the Pardons Board does not render its decisions fairly, then prisoners will perceive the system not as an incentive but as a disincentive to rehabilitation.[22]

Thus, it is vital for applicants to have their allotted time before the Pardons Board to correct mistaken information. Society can only gain thereby. Indeed, requiring a hearing on every application furthers Pennsylvania's policy in favor of prisoner rehabilitation and does not endanger the public in any way. Because the Pardons Board is not obligated to recommend that the Governor grant life on parole to an applicant after the hearing, there is certainly no threat of release of dangerous convicts into society. However, once the hearing is concluded, the Pardons Board will have gained a fairer knowledge of the applicant and will be able to make an informed recommendation to the Governor. Those prisoners who are shown to be sufficiently rehabilitated and no longer dangerous to the community will be released, and those requiring further confinement will be detained. Therefore, a balancing of policy considerations here weighs in favor of Pennsylvania's policy of prisoner rehabilitation.

**18.** Although the Pardons Board has no published standards, in practice, the Pardons Board applies standards of eligibility that parallel those mandated by statute for the Parole Board. This is proper because, without standards, any decision is arbitrary; moreover, if the Pardons Board applied standards of eligibility for life on parole *different* from those standards applied by the Parole Board in non-capital and non-life cases, then the system would not be uniform. Section 19 of the Parole Act, 61 P.S. § 331.19, requires that the Parole Board consider:

> the nature and character of the offense committed, any recommendation made by the trial judge, the general character and history of the prisoner and the written or personal statement or testimony of the victim or the victim's family submitted pursuant to section 22.1 of this act.
> The board shall, in all cases, consider the recommendations of the trial judge and of the district attorney and of each warden or superintendent, as the case may be, who has had charge of an applicant, each of whom is directed to submit to the board his recommendation and the reasons therefor, with respect to each parole application.

Although the criteria are not statutorily defined specifically for the Pardons Board, the Pardons Board, in reviewing an application for life on parole, nevertheless considers the nature and character of the offense committed, the general character and history of the prisoner and recommendations of the trial judge, district attorney and the superintendent who has had charge of the applicant. *Oversight Hearing* (testimony of John A. Lord, Secretary, Pardons Board).

**19.** "[W]hen a State adopts a parole system that applies general standards of eligibility, prisoners justifiably expect that parole will be granted fairly and according to law whenever those standards are met." *Greenholtz v. Inmates of Nebraska Penal and Correctional Institution,* 442 U.S. 1, 19, 99 S.Ct. 2100, 2110, 60 L.Ed.2d 668 (1979) (Powell, J., concurring in part and dissenting in part).

**20.** Prior to the adoption of the Parole Act in 1941, the Governor appointed a special commission to study parole in Pennsylvania. The commission's report stated:

> The Commission [disapproves of] the suggestion that is frequently advanced that the apparently confirmed criminal should be incarcerated for life for the protection of society. There may be particular instances in which this becomes necessary, but *the right of the individual to an opportunity to work out his own destiny and well-being at liberty,* and in accordance with law, *outweighs any supposed right of society* to deprive him of this opportunity upon the mere fear or assumption that he will again transgress the law.

Governor's Commission, Report on the Probation and Parole System (1938), Wile at 451 (emphasis added).

**21.** Society has an interest in not having parole denied because of erroneous information. *Cf. Morrissey.*

**22.** The U.S. Supreme Court has stated with respect to parole systems that "fair treatment ... will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." *Morrissey,* 408 U.S. at 484, 92 S.Ct. at 2602.

## III. Relevant Case Law From Other States

The Majority relies on case law from other states for the proposition that Hennessey has no liberty interest here. The Majority considers *Greenholtz v. Inmates of Nebraska Penal and Correctional Institution,* 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), and concludes that, unlike Nebraska in *Greenholtz,* Pennsylvania does not mandate by statute that the Pardons Board "shall" order a prisoner's release "unless" there is a valid reason for denial. In addition, the Majority considers *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981), and concludes that, like Connecticut in *Dumschat,* Pennsylvania gives the Pardons Board absolute discretion, having no definitions, no criteria, and no mandated "shalls." (Majority op. at 220.) I cannot agree with this analysis.

Unlike the Majority, I believe that the presence of a commutation/parole system in Pennsylvania confers on Hennessey a liberty interest in the decision to grant or deny him life on parole, i.e., Hennessey has a liberty interest in not being denied life on parole for arbitrary or constitutionally impermissible reasons.[23] Moreover, as shown above, Pennsylvania does not give the Pardons Board absolute discretion but, rather, as part of Pennsylvania's uniform and exclusive parole

system, the Pardons Board must utilize standards of parole eligibility defined by statute.

In *Block v. Potter,* 631 F.2d 233, 236 (3rd Cir.1980) (emphasis added), the Third Circuit Court of Appeals stated:

> Even if a state statute does not give rise to a liberty interest in parole release under Greenholtz, once a state institutes a parole system *all prisoners have a liberty interest flowing directly from the due process clause in not being denied parole for arbitrary or constitutionally impermissible reasons.*

Thus, even though no Pennsylvania statute gives rise to a liberty interest in commutation of a life sentence to life on parole, the existence in Pennsylvania of a commutation/parole system gives all prisoners a liberty interest in not being denied a commutation for arbitrary or constitutionally impermissible reasons.

Accordingly, Hennessey is entitled to both procedural and substantive due process protection.[24] Here, the Pardons Board denied Hennessey procedural due process protection by failing to grant him a hearing before denial of his application. The Pardons Board also denied Hennessey his substantive due process rights because its review procedures, which permit an arbitrary decision based on false information to stand without recourse, are subject to taint, impropriety and lack of fairness.[25]

---

**23.** In *Greenholtz,* 442 U.S. at 23, 99 S.Ct. at 2111-12 (Marshall, J., dissenting in part) (emphasis added) (footnote omitted), Justice Marshall stated:

> It is self-evident that all individuals possess a liberty interest in being free from physical restraint. Upon conviction for a crime, of course, an individual may be deprived of this liberty to the extent authorized by penal statutes. *But when a State enacts a ... system, and creates the possibility of release from incarceration upon satisfaction of certain conditions, it necessarily qualifies that initial deprivation.* In my judgment, it is the *existence of this system* which allows prison inmates to retain their protected interest in securing freedoms available outside prison.

**24.** In *Dumschat,* 452 U.S. at 471, 101 S.Ct. at 2468 (Stevens, J., dissenting) (emphasis added), Justice Stevens stated:

> This case involves the ... process for determining when a relatively small group of serious offenders will be released from custody.

> Routinely that process includes three determinations: the judge imposes a life sentence; the Board of Pardons in due course commutes that sentence; and finally the Board of Parole discharges the prisoner from custody. Each of these three decisions is a regular and critical component of the decisionmaking process employed by the State ... to determine the magnitude of its deprivation of the prisoner's liberty. *In my opinion the Due Process Clause applies to each step and denies the State the power to act arbitrarily.*

**25.** Pennsylvania's Attorney General testified before the Senate Judiciary Committee on December 14, 1994 that, as a member of the Pardons Board, he consistently votes against commutation for lifers and that only a very, very small number of lifers meet his stringent criteria for commutation. The Attorney General requires, as a minimum, that a lifer serve 23–25 years in prison and reach 55 years of age before becoming eligible for commutation. In his testimony, he acknowledged that the average lifer in Penn-

## IV. Text

Article IV, Section 9 states that the Governor shall have power to grant commutation of sentences, but no sentence shall be commuted except on the recommendation of the Pardons Board after full hearing in open session. Therefore, the Governor only has the power and duty to review applications deemed meritorious by the Pardons Board. However, if the Pardons Board rejects a meritorious application without a hearing because of tainted information in opposition to the application, then the Governor's constitutional obligation to review every meritorious application would be thwarted. Thus, the text must require that the Pardons Board hold a hearing on every application.

## V. Conclusion

Accordingly, because I believe that constitutional history and subsequent Pennsylvania case law indicate that the framers of Article IV, Section 9 of the Pennsylvania Constitution intended to require a public hearing on every application for clemency, because policy considerations weigh in favor of a public hearing on every application, because Hennessey has a protected liberty interest in the ultimate decision on his application for commutation and because the Pardons Board must hold such a hearing in order to enable the Governor to exercise his constitutional power to grant clemency, I would hold that Hennessey has a right to a public hearing on his application.

SMITH, J., joins in the conclusion of this dissenting opinion.

sylvania serves 23 years, "far greater than virtually every other state in America." The Attorney General will not vote to grant a hearing to an applicant who does not meet these requirements; moreover, even when an applicant does satisfy these criteria, the Attorney General will not vote to grant a hearing if there is negative information in the Pardons Board's investigatory materials. *Oversight Hearing* (testimony of Attorney General, Ernest D. Preate, Jr.).