MERRITT, Circuit Judge,
concurring.
I concur fully in the result and in the reasoning of Judge Moore’s opinion for the Court in Sections I, II and IV. I concur in the result reached but not all of the language and reasoning of part III of Judge Moore’s opinion. I concur in the result reached in part III because I agree that the case should be remanded to the District Court for findings and conclusions on the Fifth Amendment argument raised by Woodard.
DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.
Insofar as this court’s judgment affirms that of the district court, I concur. Insofar as the judgment of the district court is vacated and the case remanded for further proceedings, I respectfully dissent.
I
On the evening of June 20, 1990, a 19-year-old college student named Mani Akram was driving an Oldsmobile car down Harvard Avenue near East 175th Street in the city of Cleveland. The vehicle was equipped with custom wheels and a special stereo system.
Four young men who had decided to go “gaffling”[1] in a ear stolen earlier in the evening spotted Mr. Akram’s vehicle and intentionally collided with it. Two of the gaf-flers got out of the stolen car, and one of them — identified by an eye witness as appellant Eugene Woodard — went up to the Oldsmobile and shot Mr. Akram in the chest with a handgun.
Mr. Akram, who subsequently died from the wound, was dumped on the ground and left there for dead. His car was driven away, stripped, and torched. The gafflers argued over the division of the spoils, and a witness testified at trial that he heard Mr. Woodard say “I should get the radio. I’m the one that shot the guy.” Other witnesses testified that they heard Mr. Woodard make similar statements, including, “I’m the one with the murder case,” and “if the nigger die, it’s me that shot him, so I should get the most.” See Woodard, 68 Ohio St.3d at 71, 623 N.E.2d at 76-77.
An Ohio jury found Mr. Woodard guilty of a number of crimes, including aggravated murder in the commission of a felony. The jury recommended imposition of the death penalty, and this recommendation was accepted by the trial court. Affirmances by a state court of appeals (see State v. Woodard, 1992 WL 84888 (Ohio App. 8th Dist. Apr. 23, 1992)) and the Supreme Court of Ohio followed. Mr. Woodard is now pursuing collateral remedies in the Ohio courts, as I understand it. His lawyers have said that if these efforts are unsuccessful, Woodard will seek habeas corpus relief in the federal courts.
Should these attempts to obtain collateral relief meet the same fate that the direct appeals did, Mr. Woodard plans to throw himself on the mercy of Ohio’s governor. Article III, § 11 of the Ohio Constitution, as amended effective January 1, 1996, empowers the governor “to grant reprieves, commutations, and pardons, for all crimes and offenses, except treason and cases of impeachment, upon such conditions as the Governor may think proper....” As noted in the report and recommendation issued by the magistrate judge in the present civil rights action, “the Governor enjoys almost unfettered discretion in determining whether to grant or deny clemency.” (Citation omitted.)
The manner of applying for pardons has long been subject to regulation by the Ohio General Assembly, and the constitutional amendment that became effective at the beginning of 1996 subjected the manner of ap *-389 plying for commutations to such regulation as well. It is crystal clear, however, that the legislature may not prescribe substantive regulations limiting the Governor’s discretion to grant or withhold either type of clemency. “For example, the General Assembly could not ... enact a statute requiring the Governor to accept the recommendation of the [Ohio Adult Parole Authority] in the exercise of his clemency power.” State ex rel. Maurer v. Sheward, 71 Ohio St.3d 513, 520, 644 N.E.2d 369, 375 (1994).
Under Ohio Rev.Code § 2967.07, all applications for executive clemency must be made in writing to the Ohio Adult Parole Authority. Mr. Woodard has not yet submitted such an application. The parole authority (or “parole board,” as it sometimes calls itself) nonetheless scheduled a “clemency review” for Mr. Woodard to be held on September 16, 1994. In connection with the review Mr. Woodard was notified that he could have a pre-hearing interview with representatives of the parole board if he wished. This notification prompted the filing of the present civil rights suit, in which Mr. Woodard seeks a declaration that Ohio’s death penalty clemency procedure is unconstitutional.
There appears to have been nothing sinister in the parole board’s decision to initiate a clemency review before the filing of an application therefor. Under an Ohio Department of Rehabilitation and Correction regulation that became effective on July 21, 1994 — the “Death Penalty Clemency Procedure” challenged here by Mr. Woodard — the parole board must schedule a clemency review 45 days in advance of any scheduled execution date, unless that date has been stayed. The Ohio Supreme Court did not stay Mr. Woodard’s execution until after the 45-day clock had started running, so the parole board seems to have had no choice in the matter. On the day after the filing of the complaint in the present lawsuit, however,' the parties agreed to postpone the clemency review and not to reschedule it during the pendency of the suit without 30 days’ notice. The district court subsequently entered a consent order to that effect.
If and when the parole board has occasion to reschedule the clemency review, the challenged regulation will give Mr. Woodard the option of requesting a personal interview. Part IV C.2. of the regulation provides as follows:
“If the prisoner requests the personal interview, the parole board chair will appoint one or more board members or hearing officers to interview the prisoner at the confining institution. Only the prisoner and the person or persons assigned by the parole board chair shall be present at the interview.”
The regulation goes on to provide that any statement given by the prisoner at the interview shall be considered at the clemency hearing, along with all other relevant information that is available. (Such information can, of course, include affidavits, briefs, or other materials submitted by the prisoner’s counsel.)
It was the submission of the parole board, in its motion for judgment, that an executive clemency review is not an integral part of any prior judicial proceedings; that there is no constitutional right to counsel at a clemency interview conducted pursuant to the prisoner’s request; and that Ohio’s executive clemency procedure does not compel the prisoner to be a witness against himself in violation of the Fifth Amendment. Magistrate Judge Kemp and District Judge Kin-neary agreed with these submissions.' I agree with them too.
II
The Declaration of Independence declares it to be self-evident that all men are endowed by their Creator with unalienable rights to life and to liberty. These God-given rights are not absolute — if a Eugene Woodard takes the life of a Mani Akram in the commission of a felony, for example, the murderer obviously runs a risk that the state may take his life in return — but our Constitution prohibits a state from depriving any person of life or liberty without due process of law.
My colleagues on the panel discern two strands in the due process jurisprudence relevant to the case before us. The first strand involves life or liberty interests that would not exist at all if not created by state or *-388 federal law in connection with the establishment of a procedure such as the one at issue here. The second strand involves “life” and “liberty” in the ordinary sense of those terms — i.e., life and liberty interests that are independent of any state procedure.
As to the first strand, Judge Moore’s lead opinion concludes (relying in part upon Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981)) that Mr. Woodard has no constitutionally protected life or liberty interest in Ohio’s clemency procedure itself. This conclusion is clearly correct, in my view.
As to the second strand, the lead opinion suggests (with Judge Merritt fully concurring) that the State of Ohio has made its clemency procedure “an integral part of the ... system for finally adjudicating the guilt or innocence of a defendant.” See Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956), as quoted in Evitts v. Lucey, 469 U.S. 387, 393, 105 S.Ct. 830, 834, 83 L.Ed.2d 821 (1985). The court concludes from this that Ohio’s clemency procedure must be subjected to the same type of due process scrutiny applicable to every other stage of the adjudicatory process. I have difficulty reconciling this conclusion with what the Supreme Court did in Dumschat.
The plaintiff in Dumschat was a convicted murderer serving a life sentence in the Connecticut prison system. He had repeatedly applied to the Connecticut Board of Pardons for commutation of his sentence, and the Board had rejected each application without explanation. Mr. Dumschat brought a civil rights suit requesting the federal courts to declare that the Board had violated his due process rights in denying his applications without giving any reasons for doing so. The Supreme Court refused to entertain this request, finding no constitutional liberty interest that could trigger due process protection.
It is true that the Court’s opinion in Dumschat — an opinion delivered by Chief Justice Burger — dealt largely with the question whether Connecticut itself had created a federally protected liberty interest. My colleagues’ taxonomy places this sort of question in the first strand of due process jurisprudence, not the second strand. But it cannot be supposed that the Dumschat Court simply overlooked the second strand. Every member of the Court obviously knew that, as Justice Stevens explicitly said in dissent, the liberty protected by the Constitution “is not merely ‘a statutory creation of the State.’ ” Dumschat, 452 U.S. at 469, 101 S.Ct. at 2466 (Stevens, J., dissenting), quoting Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 2976, 41 L.Ed.2d 935 (1974). Both strands of due process jurisprudence were unquestionably implicated by the facts presented in Dumschat.
Justice Stevens would have dealt with the second strand in much the same way that my colleagues have done here. As Justice Stevens saw it, the decision to grant or withhold commutation of the prisoner’s sentence in Dumschat constituted “a regular and critical component of the decisionmaking process employed by the State of Connecticut to determine the magnitude of its deprivation of the prisoner’s liberty.” Id. at 471, 101 S.Ct. at 2468 (footnote omitted). “In my opinion,” Justice Stevens continued, “the Due Process Clause applies to each step [including the step at which clemency is granted or withheld] and denies the State the power to act arbitrarily.” Id. (footnote omitted).
I can readily appreciate the logic of Justice Stevens’ dissent, just as I can appreciate the logic of my colleagues’ apparent wish that the dissent had been the majority opinion. But there are many cases where, as the old saying has it, “a page of history is worth a volume of logic” — and it is history and tradition, I take it, on which the majority of the Supreme Court relied in declining to follow the course urged by Justice Stevens in Dum-schat. “[P]ardon and commutation decisions,” as Chief Justice Burger said for the majority, “have not traditionally been the business of' courts; as such, they are rarely, if ever, appropriate subjects for judicial review.” Dumschat, 452 U.S. at 464, 101 S.Ct. at 2464, citing Meachum v. Fano, 427 U.S. 215, 225, 96 S.Ct. 2532, 2538-39, 49 L.Ed.2d 451 (1976) (footnote omitted).
Evitts v. Lucey, decided four years after Dumschat, did not purport to overrule that case — and Evitts did not involve anything *-387 remotely resembling a pardon or commutation decision. The question presented in Ev-itts, rather, was whether the Due Process Clause guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right. The Court answered this question in the affirmative, notwithstanding the absence of a constitutional requirement for any right of appeal at all. If a state elects to create an appellate procedure as an integral part of its adjudicatory process, the Evitts Court reasoned, the procedure must meet the demands of the Due Process Clause.
It may be true, as my colleagues suggest, that the same reasoning logically applies to any and all proceedings made available by the government beyond the first appeal as of right. But the Supreme Court has sometimes been dubious about the wisdom of pushing the logic of its decisions to the extreme. To do so can produce unintended consequences in the real world, for one thing,[2] to say nothing of creating hopeless doctrinal conflicts. Evitts itself points out, citing Ross v. Moffitt, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), that the constitutional right to counsel is limited to the first appeal as of right and does not extend as far as habeas corpus proceedings. Evitts, 469 U.S. at 394, 105 S.Ct. at 834-35. Yet habeas proceedings, I should have thought, form an integral part of the adjudicative system much more clearly than executive clemency proceedings do.
Acknowledging the “great distance” that lies between the trial and appeal stage, on the one hand, and the executive clemency stage on the other, my colleagues suggest that the due process protections mandated at the clemency stage “will necessarily be minimal, perhaps even barely perceptible....” But once the camel’s nose is under the tent, I suspect that it may prove difficult to keep the rest of the animal out. And if it really is true that clemency proceedings are to be constitutionalized only to a degree that is barely perceptible, perhaps this in itself casts doubt on the justification for constitutionaliz-ing such proceedings in the first place. No other federal court has done so, as far as I am aware — and generally speaking, at least, we have it on the highest authority that judicial review of clemency proceedings is simply not “appropriate.” Dumschat, 452 U.S. at 464, 101 S.Ct. at 2464.
Ill
Part III of the lead opinion, as to which Judge Merritt has concurred in result but not in all of the language and reasoning, addresses Mr. Woodard’s argument that Ohio’s clemency procedure presents death row inmates with a “Hobson’s choice” between participating in the procedure, on the one hand, and asserting a Fifth Amendment privilege against self-incrimination on the other hand. Noting that the argument “raises the specter of an unconstitutional condition,” and suggesting that there may be no “compelling state interest in requiring waiver of Fifth Amendment rights by clemency interviewees,” the opinion concludes that, absent any such state interest, “Woodard has raised a colorable unconstitutional conditions claim” that necessitates a remand of the case.
With respect, I disagree. Mr. Woodard has not raised a colorable unconstitutional conditions claim, in my view; the concerns he raises strike me as far too spectral, at this point, to warrant intervention by a federal court.
The Fifth Amendment, as applied to the states by the Fourteenth Amendment, says that “[no person] shall be compelled in any criminal case to be a witness against himself. ...” Mr. Woodard, who is represented by able counsel, is surely not unaware of this provision. And if Mr. Woodard should choose to exercise the option of speaking *-386 privately to representatives of the board that will issue a recommendation on relief from the death sentence, I am aware of no reason at all to suppose that he could be “compelled” to say anything that might be offered against him in a different criminal case or in a new trial for the murder of which he currently stands convicted.
Ohio’s clemency procedures, as I read them, do not empower the parole board or its representatives to compel a prisoner who requests a personal interview to answer a single question — or, having answered some questions, to answer others that may be asked. On its face, the challenged regulation simply does not require a waiver of the Fifth Amendment right against self-incrimination; as far as the regulation discloses, a prisoner who requests a clemency interview remains free to say as much or as little at the interview as he wishes.[3]
It is conceivable, of course, that a prisoner who requests a personal interview could volunteer something that might tend to incriminate him. It is conceivable that evidence of what the prisoner volunteered could later be offered against him in an Ohio court. And it is conceivable that the Ohio court could rule such evidence admissible, just as it is conceivable that such a ruling could be upheld on appeal. But I think it would be “premature,” to borrow the adjective used by the United States Supreme Court in Baxter v. Palmigiano, 425 U.S. 308, 324, 96 S.Ct. 1551, 1560-61, 47 L.Ed.2d 810 (1976), for a federal court to instruct Ohio on how to deal with situations that may never materialize at all and the facts of which can only be imagined at this point.
What is it, precisely — besides writing a longer opinion — that the district court is supposed to do with this case on remand? We are told that the district court should “analyze Woodard’s specific arguments under Ev-itts ” and the principles outlined in Part II of this court’s opinion, but Part II itself would seem to have accomplished much of this task already. Perhaps the district court is to hold an evidentiary hearing to determine what percentage of prisoners granted clemency have taken advantage of the interview option. Dumschat, however, seems to suggest that this datum would be irrelevant. See 452 U.S. at 465, 101 S.Ct. at 2465. In any event, we are told that the district court should “determine more fully the nature of the APA’s clemency procedures,” consider whether the clemency interview procedure “might” impose an unconstitutional condition, and decide whether Mr. Woodard will “risk” self-incrimination if he participates in an interview. The assessment of such a risk ex ante will be a highly theoretical undertaking, it seems fair to say, and I seriously question its utility.
Mr. Woodard tells us in his complaint that he “does not contemplate that this action will have any effect on his state convictions and/or sentences (including his death sentence) _” (Emphasis in original.) If there is a theoretical risk of self-incrimination here, it is a risk relating to criminal proceedings that have not yet been initiated and may never be initiated. In this respect, it seems to me, the case at bar is precisely analogous to Baxter v. Palmigiano. And just as the relief granted by the lower courts in Baxter was held to be “premature” (at least insofar as it was not flatly inconsistent with Wolff v. McDonnell), I think it is premature for us to require the district court to consider granting relief against a risk of self-incrimination that is purely academic at this point.
I would affirm the judgment of the district court across the board.

. The term has been defined as “forcibly removing people from their cars to rob them." State v. Woodard, 68 Ohio St.3d 70, 71, 623 N.E.2d 75, 76 (1993), cert. denied, 512 U.S. 1246, 114 S.Ct. 2770, 129 L.Ed.2d 883 (1994).

. In Sandin v. Conner, — U.S. —, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), for example, the Court pointed out that Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), had pushed the logic of Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), to a point that had "create[d] disincentives for States to codify prison management procedures in the interest of uniform treatment.” Sandin, — U.S. at—, 115 S.Ct. at 2299. Our disposition of the case at bar, similarly, could create disincentives for the State of Ohio to offer clemency petitioners an opportunity to have a personal interview with representatives of the parole board.

. Acknowledging that "we cannot be certain that the defendants would actually impose” a waiver requirement, the lead opinion suggests that for present purposes we must accept the allegations of the plaintiff's complaint as true. But the complaint merely pleads, in conclusory form, that "Mr. Woodard will be irreparably harmed in that he will be permanently deprived of his Fifth ... and Fourteenth Amendment rights against self-incrimination_" The pleading of a legal conclusion such as this does not foreclose us from making our own assessment of the law in light of all well-pleaded facts. The regulation containing the Ohio Death Penalty Clemency Procedure is properly before us, I believe, but speculation as to matters not addressed in the regulation can hardly qualify as a well-pleaded fact.