**Robert Carl FOLEY and Ralph Baze, Appellants**

v.

**Steve BESHEAR, Governor of Kentucky; LaDonna Thompson, in her Official Capacity as Commissioner of the Kentucky Department of Corrections; and the Kentucky Parole Board, Appellees**

2013–SC–000777–MR

Supreme Court of Kentucky.

RENDERED: JUNE 11, 2015

Counsel for Appellants: Euva Denean Blandford, Meggan Elizabeth Smith, Assistant Public Advocate, Department of Public Advocacy

Counsel for Steve Beshear, Governor of Kentucky, Appellee: Steven Travis Mayo, Jessica R.C. Malloy, Assistant Attorney General, Office of the Attorney General

Counsel for LaDonna Thompson, in her Official Capacity as Commissioner of the Kentucky Department of Corrections, Appellee: Angela Turner Dunham, Justice and Public Safety Cabinet, Office of Legal Services

Counsel for the Kentucky Parole Board, Appellee: John C. Cummings, Justice and Public Safety Cabinet, Office of Legal Services

## OPINION OF THE COURT BY JUSTICE ABRAMSON

Death-row inmates Robert Foley and Ralph Baze appeal from an Order of the Franklin Circuit Court dismissing their Kentucky Revised Statute (KRS) 418.040 complaint for a declaratory judgment to the effect that "the Kentucky procedures outlining the submission and review of a petition for executive clemency [are] constitutionally inadequate." Appellants sought an order requiring the Governor, and/or the Department of Corrections (through its Commissioner, LaDonna Thompson), and/or the Kentucky Parole Board "to adopt adequate policies and procedures regarding clemency petitions."

They further sought an order requiring the Parole Board "to adopt administrative procedures governing the ways in which they [the Board] must conduct clemency investigations." The three defendants, Appellees in this Court, all moved to have the complaint dismissed, and following a hearing and supplemental filings, the trial court granted the defense motions. The court noted that Section 77 of the Constitution of Kentucky vests the power to grant pardons in the Governor. In the court's view, "It would violate the separation of powers for the courts to attempt to dictate to the Governor the procedures he must employ in considering pardons." Baze and Foley contend that the trial court's reliance on the separation of powers doctrine was inappropriate. As they see it, Kentucky's "paucity" of clemency-related legislation allows for arbitrary clemency decisions and thus violates their rights to due process under the Fourteenth Amendment to the Constitution of the United States,[1] a violation the court's can address without trespassing on the power of the executive. Convinced that Appellants' petition has failed to state a claim for relief, we affirm the trial court's order dismissing the complaint.

### RELEVANT FACTS

Both Foley and Baze have been convicted of multiple murders and sentenced to death. Foley was convicted in the Laurel Circuit Court of the 1991 murders of brothers Rodney and Harry Lynn Vaughn and for both killings he was given the death penalty. The conviction and sentence were affirmed in Foley v. Commonwealth, 942 S.W.2d 876 (Ky.1996), cert.

---

1. Appellants' original petition also invoked the due-process provisions of our Kentucky Constitution and alleged cruel and unusual punishment claims under the Eighth Amendment of the federal Constitution as well as violation of Kentucky's Administrative Procedures Act. Before us, however, Appellants have argued only the federal due process claim, and accordingly our discussion will be similarly limited.

*denied*, 522 U.S. 893, 118 S.Ct. 234, 139 L.Ed.2d 165 (1997). Foley was also convicted in the Madison Circuit Court of four murders that took place in Laurel County in 1989, but that were not discovered until after the Vaughn murders. He was sentenced to death for each killing, and this Court upheld the conviction and sentence in *Foley v. Commonwealth*, 953 S.W.2d 924 (Ky.1997), *cert. denied*, 523 U.S. 1053, 118 S.Ct. 1375, 140 L.Ed.2d 522 (1998). Baze was convicted and sentenced to death in the Rowan Circuit Court for the 1992 murders of two police officers who were attempting to serve fugitive warrants on him in Powell County. This Court affirmed his conviction and sentence in *Baze v. Commonwealth*, 965 S.W.2d 817 (Ky. 1997), *cert. denied*, 523 U.S. 1083, 118 S.Ct. 1536, 140 L.Ed.2d 685 (1998).

In addition to their direct appeals, both Appellants have unsuccessfully pursued both state and federal collateral relief.[2] Both have also previously sought declaratory relief pursuant to KRS 418.040.[3] Baze, in fact, has already sought declaratory relief against the Department of Corrections based on an alleged violation of an asserted clemency-related right to due process. *Baze v. Thompson*, 302 S.W.3d 57 (Ky.2010) (upholding denial of claim that due process provisions of state and federal constitutions mandate that death row inmate have access to prison personnel and other inmates in furtherance of the preparation of a clemency petition).[4]

Appellants tendered the present KRS 418.040 complaint in April 2013. The complaint does not address the statute's requirement that there exist an "actual controversy" between the parties, and in particular Appellants do not allege that the Governor has arbitrarily denied their petitions for clemency or even that they have filed petitions for clemency. Implicit in the complaint, however, is the notion that as death row inmates who have exhausted their appeals Appellants presently have a strong interest in being considered for clemency such that an actual controversy exists between them and the state officials who, according to Appellants, by failing to adopt clemency standards and procedures have, in violation of the federal constitution, "create[d] the overwhelming risk of both an arbitrary review and arbi-

---

**2.** *See Foley v. Commonwealth*, 17 S.W.3d 878 (Ky.2000) (RCr 11.42 motion); *Foley v. Parker*, 488 F.3d 377 (6th Cir.2007) (habeas corpus petition); *Foley v. Commonwealth*, 425 S.W.3d 880 (Ky.2014) (CR 60.02 motion). *Baze v. Commonwealth*, 23 S.W.3d 619 (Ky. 2000) (RCr 11.42 motion); *Baze v. Parker*, 371 F.3d 310 (6th Cir.2004) (habeas corpus petition); *Baze v. Commonwealth*, 276 S.W.3d 761 (Ky.2008) (CR 60.02 motion).

**3.** In 2008, for example, Foley sought a declaration regarding the constitutionality of the self-defense statute in effect at the time of the Vaughn killings. *Foley v. Commonwealth*, 306 S.W.3d 28 (Ky.2010) (upholding dismissal of the complaint because it failed adequately to allege the existence of an actual controversy).

**4.** In *Bowling v. Ky. Dept. of Corrections*, 301 S.W.3d 478 (Ky.2009), we explained that while KRS 418.040 can be an appropriate means for death row inmates to bring challenges regarding the implementation of their sentences against nonparties to the criminal action, the statute does not allow for successive, piecemeal litigation of such challenges. The statute requires, rather, death row inmates "to join all claims regarding implementation of their sentences of execution in their original declaratory judgment action." 301 S.W.3d at 481. Baze's present claim against the Department of Corrections is plainly successive of his claim in *Baze v. Thompson* and should have been dismissed on that ground. Foley's claim is not successive, however, and because we thus must address the merits of the parties' due process argument in any event, we need not decide whether Baze's prior clemency-related claim against the Department of Corrections bars his current claims against the Governor and the Parole Board.

trary denial of an inmate's [clemency] petition." The trial court rejected this contention, and so do we.

### ANALYSIS

 Section 77 of the Constitution of Kentucky empowers the Governor to "remit fines and forfeitures, commute sentences, [and] grant reprieves and pardons."[5] KRS 439.450 provides that "[o]n request of the Governor the [parole] board shall investigate and report to him with respect to any case of pardon, commutation of sentence, reprieve or remission of fine or forfeiture." Neither Section 77, KRS 439.450, nor any "other constitutional provision or statute" we have noted, "establishes specific procedures to be followed or imposes standards or criteria for the clemency decision. In short, [in Kentucky,] the decision to grant clemency is left to the unfettered discretion of the Governor." *Baze v. Thompson*, 302 S.W.3d at 60. The Governor's decision, however, must include "a statement of the reasons for his decision," and the clemency application and statement must "always be open to public inspection." Ky. Const., § 77.

In *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981), the United States Supreme Court addressed a claim by inmates serving life sentences that the similarly unfettered Connecticut Board of Pardons had violated the Due Process Clause of the Fourteenth Amendment when it denied their petitions for sentence commutation without offering any explanation of the denials. Rejecting that claim, the Supreme Court began by reiterating what it said in *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), that "[t]here is *no constitutional or inherent right* of a convicted person to be conditionally released before the expiration of a valid sentence." *Dumschat*, 452 U.S. at 464, 101 S.Ct. 2460 (quoting *Greenholtz*, 442 U.S. at 7, 99 S.Ct. 2100) (emphasis supplied in *Dumschat*).

 Even in the absence of a substantive constitutional right, however, the federal Constitution's procedural protections can sometimes be called into play by substantive rights emanating from other sources. "A state-created right can, in some circumstances, beget yet other rights to procedures essential to the realization of the parent right." *Dumschat*, 452 U.S. at 463, 101 S.Ct. 2460 (citations omitted). "Plainly, however, the underlying right must have come into existence before it can trigger due process protection." *Id.* (citation omitted).

In Connecticut, the Court observed, no right to commutation or to pardon had come into existence. "[A] Connecticut felon's expectation that a lawfully imposed sentence will be commuted or that he will be pardoned is no more substantial than an inmate's expectation, for example, that he will not be transferred to another prison; it is simply a unilateral hope."[6] *Dum-*

---

5. Section 77 provides in its entirety as follows:

He shall have power to remit fines and forfeitures, commute sentences, grant reprieves and pardons, except in case of impeachment, and he shall file with each application therefor a statement of the reasons for his decision thereon, which application and statement shall always be open to public inspection. In cases of treason, he shall have power to grant reprieves until the end of the next session of the General Assembly, in which the power of pardoning shall be vested; but he shall have no power to remit the fees of the Clerk, Sheriff or Commonwealth's Attorney in penal or criminal cases.

6. Interestingly, approximately three-fourths of the Connecticut inmates serving life sentences who sought relief from the Board of Pardons

*schat*, 452 U.S. at 465, 101 S.Ct. 2460 (citations omitted). Unlike the parole statute at issue in *Greenholtz*, which did create a right to conditional release upon a showing of specified facts and thus did implicate due-process protections, Connecticut's pardon statute placed no obligations on the authority exercising clemency. As with Kentucky's Governor, rather, that authority, the Connecticut Board of Pardons, was vested with "unfettered discretion" to rule on clemency requests. *Dumschat*, 452 U.S. at 466, 101 S.Ct. 2460. "The statute imposes no limit on what procedure is to be followed, what evidence may be considered, or what criteria are to be applied by the Board." *Id.*

Much like Appellants here, the Connecticut inmates argued that it was "precisely because of 'the absence of any apparent standards,'" *id.* that the Board's procedure ran afoul of the Due Process Clause. The Court, however, rejected that attempt to infer a substantive right to clemency from the mere opportunity to apply for it, and so rejected as well the claim to procedural rights to protect the non-existent substantive one. "The Connecticut commutation statute, having no definitions, no criteria, and no mandated 'shalls,' creates no analogous duty or constitutional entitlement.... [T]he mere existence of a power to commute a lawfully imposed sentence, and the granting of commutations to many petitioners, create no right or 'entitlement.'" *Dumschat*, 452 U.S. at 466–67, 101 S.Ct. 2460. The Court held, accordingly, that "the power vested in the Connecticut Board of Pardons to commute sentences conferred no rights on respondents beyond the right to seek commutation." *Dumschat*, 452 U.S. at 467, 101 S.Ct. 2460.

*Dumschat* was decided in 1981. Nearly twenty years later, in *Ohio Adult Parole*

received some form of commutation. *Dum-*

*Authority v. Woodard*, 523 U.S. 272, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998), Eugene Woodard, an Ohio inmate under sentence of death, brought a similar challenge to that state's clemency procedures. As the U.S. Supreme Court explained, under the then-existing Ohio clemency regime, the Governor had the power to grant clemency upon such conditions as he or she thought proper, but in large part the Ohio General Assembly had delegated (pursuant to the Ohio Constitution) the conduct of clemency review to the Ohio Adult Parole Authority. *Woodard*, 523 U.S. at 276, 118 S.Ct. 1244. That review included, in death penalty cases at least, an opportunity for the inmate to be interviewed by one or more members of the parole board and a mandatory clemency hearing. Inmate Woodard complained that in various ways—inadequate notice, limitations on the assistance of counsel, limitations on his ability to testify at the hearing and to submit documentary evidence—the Authority's review proceedings violated his rights under the Fourteenth Amendment's Due Process Clause.

Four members of the Court, Chief Justice Rehnquist and Justices Scalia, Kennedy, and Thomas, thought that relief should be denied under *Dumschat*. Rejecting a proffered distinction based on the life sentence involved in *Dumschat* as opposed to the death penalty confronting Woodard, Chief Justice Rehnquist's Opinion explained that Ohio's clemency regime no more created a right to clemency than did Connecticut's. "A death row inmate's petition for clemency is also a 'unilateral hope.'" *Woodard*, 523 U.S. at 282, 118 S.Ct. 1244. The Chief Justice also rejected the argument that clemency proceedings, even those in death-penalty cases, are analogous to judicial review proceedings

*schat*, 452 U.S. at 459, 101 S.Ct. 2460.

and serve as "an integral part of the system for finally adjudicating the guilt or innocence of a defendant." *Id.* at 285, 118 S.Ct. 1244 (citation and internal quotation marks omitted.). Traditionally, rather, clemency has not " 'been the business of courts,' " *id.* at 284, 118 S.Ct. 1244, but rather "a matter of grace committed to the executive authority." *Id.* at 285, 118 S.Ct. 1244. There being thus under Ohio law no substantive right to clemency, Ohio's clemency proceedings, like Connecticut's, did not implicate much less violate the Due Process Clause.

Five Justices, however, agreed with Woodard that the death penalty he faced distinguished his case from *Dumschat.* Concurring in part and dissenting in part, Justice Stevens wrote that

> There are valid reasons for concluding that even if due process is required in clemency proceedings, only the most basic elements of fair procedure are required. Presumably a State might eliminate this aspect of capital sentencing entirely, and it unquestionably may allow the executive virtually unfettered discretion in determining the merits of appeals for mercy. Nevertheless, there are equally valid reasons for concluding that these proceedings are not entirely exempt from judicial review. I think, for example, that no one would contend that a Governor could ignore the commands of the Equal Protection Clause and use race, religion, or political affiliation as a standard for granting or denying clemency. Our cases also support the conclusion that if a State adopts a clemency procedure as an integral part of its system for finally determining whether to deprive a person of life, that procedure must comport—with the Due Process Clause.

*Woodard,* 523 U.S. at 292, 118 S.Ct. 1244. Justice Stevens, accordingly, was in favor of remanding the case to the district court "for a determination whether Ohio's procedures meet the minimum requirements of due process." *Id.* at 295, 118 S.Ct. 1244.

Writing for herself and Justices Souter, Ginsburg, and Breyer, Justice O'Connor agreed with Justice Stevens that Woodard's interest in not being unjustly deprived of his life implicated the Due Process Clause even after his conviction and the removal of the presumption of innocence. She therefore concluded that in these circumstances

> some *minimal* procedural safeguards apply to clemency proceedings. Judicial intervention might, for example, be warranted in the face of a scheme whereby a state official flipped a coin to determine whether to grant clemency, or in a case where the State arbitrarily denied a prisoner any access to its clemency process.

*Id.* at 289, 118 S.Ct. 1244 (emphasis in original). Justice O'Connor did not think a remand was necessary, however (agreeing to that extent with Chief Justice Rehnquist), because in her view the process Woodard received—he was given three days notice of the opportunity to participate in an interview with one or more members of the parole board and was given ten days notice of the clemency hearing—not only comported with Ohio's regulations, but also "observe[d] whatever limitations the Due Process Clause may impose on clemency proceedings." *Id.* at 290, 118 S.Ct. 1244.

There being no majority opinion in *Woodard,* Justice O'Connor's opinion, with a narrower holding on the due-process question than the opinion of Justice Stevens, is the one that controls. *Panetti v. Quarterman,* 551 U.S. 930, 949, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (noting that "[w]hen there is no majority opinion, the narrower holding controls"). We are not

persuaded that our Kentucky Constitution's near complete reliance on the Governor for clemency determinations is at odds with the *minimal* procedural safeguards to which *Woodard* says a death row inmate applying for clemency is entitled.[7]

*Woodard* makes clear that the Fourteenth Amendment does not require the elaborate system of hearings, relevant factors, and standards that Appellants seem to seek, since the Ohio system upheld in *Woodard* provided nothing like that. Nor, on the other hand, do Appellants claim to have been arbitrarily denied access to the clemency system or to have been subjected to clemency decisions so random and arbitrary as to resemble the flip of a coin. Indeed, they are not in a position to make such claims because Foley and Baze have not yet even filed clemency petitions. Appellants contend that they are at risk of such arbitrariness because neither Section 77 nor any other Kentucky law adequately provides against it, but that contention gets things backwards. It presumes that in exercising his or her constitutional power the Governor will act arbitrarily. The presumption, however, is the opposite one.

7. A provision like Section 77 of the current Kentucky Constitution has appeared in all of Kentucky's Constitutions. The provision was originally modeled upon Article II, Section 2 of the federal Constitution, which provides in pertinent part that "he [the President] shall have power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment." Art. II, § 2, cl. 1. Kentucky's 1850 Constitution, the one preceding the current Constitution, provided that the Governor "shall have power to remit fines and forfeitures, grant reprieves and pardons, except in cases of impeachment. In cases of treason, he shall have power to grant reprieves until the end of the next session of the General Assembly, in which the power of pardoning shall be vested, but he shall have no power to remit the fees of the clerk, sheriff, or Commonwealth's Attorney, in penal or criminal cases." Kentucky Constitution (1850), Art. III, § 10.

When the current Constitution was drafted in 1890, the committee devoted to the executive department originally proposed, apparently through delegate S.E. DeHaven of Oldham and Trimble counties, that Art. III, § 10 of the 1850 Constitution simply be carried over unchanged into the new document. Debates, Ky. Constitutional Convention 1890, Vol. 1, p. 1086 (Debates). The committee on Crimes, Punishments, and Criminal Procedure then moved, through delegate C.J. Bronston of Lexington, to substitute for that provision one which would limit the Governor's power to post-conviction pardons and would require the Governor to report to the General Assembly the facts pertaining to and the reasons for all acts of clemency. Debates, p. 1087. Concern was expressed that, "The trouble [with the 1850 provision] is that there is no system about it. It depends very much upon the emotions of the incumbent at the time, and very much upon his temperament." Debates, p. 1087 (remarks by Mr. L.T. Moore, delegate from Boyd County). It was argued that a large majority of states had adopted similar provisions and that such provisions were necessary to ensure that the Governor's pardoning power was not imposed upon. Debates, pp. 1087–1123, 1245–1342 (The debate is summarized by Mr. Bronston, on behalf of the Crimes and Punishments committee, and Mr. DeHaven, on behalf of the Executive Department committee, at pp. 1323 –1338.).

In response, P.P. Johnston, the delegate from Fayette County, proposed that the 1850 provision be amended so as to require the Governor to "file with each application a statement of the reasons for his decision thereon, which shall always be open to public inspection." Debates, p. 1123. After debate spanning more than a week, the convention rejected the substitute proposed by the Crimes and Punishments committee (as well as a proposal to create a Board of Pardons and assign the clemency power to it), and adopted delegate Johnston's proposed amendment. Debates, pp 1348—1349. The Debates demonstrate that the drafters intended the Governor to retain a plenary pardon power limited only by the Constitution and checked by the political process. *Cf. Schick v. Reed*, 419 U.S. 256, 267, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974) (holding that "the pardoning power [of the president] is an enumerated power of the Constitution and that its limitations, if any, must be found in the Constitution itself").

The presumption is that if called upon the Governor will abide by the mandates of both Section 77 and the federal Due Process Clause. *Cf. McQueen v. Patton,* 948 S.W.2d 418, 419 (Ky.1997) (upholding the dismissal of a pre-petition challenge to the Governor's purportedly unconstitutional clemency policy because "we will not presume ... that the Governor will refuse to follow the constitutional mandate of Section 77 in rendering his decision."). Given that presumption, it cannot be said that the clemency regime called into being by Section 77, however bare-bones that regime may be, violates, in-and-of itself, the Fourteenth Amendment to the United States Constitution, and the trial court correctly so held. *Cf. Duvall v. Keating,* 162 F.3d 1058 (10th Cir.1998) (noting that absent evidence of arbitrary, capricious or whimsical clemency procedures, presumption was that applicant suffered no due process violation); *Faulder v. Texas Board of Pardons & Paroles,* 178 F.3d 343 (5th Cir.1999) (holding that non-public, informal clemency proceedings did not amount to due process violation).

Against this conclusion, Appellants note that petitions for clemency are often raised after appeals for judicial review have been exhausted or foreclosed. Clemency has thus provided, according to the Supreme Court, "the 'fail safe' in our criminal justice system." *Herrera v. Collins,* 506 U.S. 390, 415, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Harbison v. Bell,* 556 U.S. 180, 192, 129 S.Ct. 1481, 173 L.Ed.2d 347 (2009) (quoting *Herrera,* 506 U.S. at 411–12, 113 S.Ct. 853, for the observation that " '[c]lemency ... is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted.' "). *See also,* Brian M. Hoffstadt, *Normalizing the Federal Clemency Power,* 79 Tex. L.Rev. 561, 568 (2001) (noting that clemency has traditionally been thought to serve three roles: "as an extra-judicial mechanism of error correction, as a tool for enhancing the fairness of sentences, and as a means of ensuring political tranquility."). As such, Appellants contend, the clemency process, particularly in death penalty cases, ought to be a searching one, affording the inmate a full opportunity to show why punishment is not appropriate or to plead that mercy is.

In an attempt to cross the gap between the Supreme Court's "fail safe" observations and an actual due-process right to this searching clemency process, Appellants devote a large portion of their brief to a survey of the clemency regimes of other states and the federal government, the vast majority of which, Appellants insist, have recognized the importance of the clemency decision by mandating the decision maker to hold hearings, to weigh certain factors, and/or to consider certain evidence.[8] It appears to be true, as Ap-

---

**8.** As does the federal government, many states, it appears, vest the pardon power in the executive or in a Pardon Board, but assign some other body the task of investigating clemency requests and making recommendations to the decision maker. The decision maker's discretion may or may not be limited by the recommendation. ABA Death Penalty Moratorium Implementation Project, *State Assessment Reports,* (2006–on going); Clifford Dome and Kenneth Gewerth, *Mercy in a Climate of Retributive Justice: Interpretations From a National Survey of Executive Clemency Procedures,* 25 New England Journal on Criminal and Civil Confinement 413 (1999). The Pardon Attorney's Office, for example, as Appellants note, assists the President by accepting and investigating federal clemency requests and by making clemency recommendations. Contrary to Appellants' suggestion, however, the Pardon Attorney is not constitutionally required, and as President Clinton's controversial pardons at the end of his presidency demonstrate, the existence of the Pardon Attorney in no way "fetters" the President's power to grant pardons outside the Pardon Attorney process if he or she so

pellants claim, that some of our sister states have adopted more formal capital clemency proceedings than Kentucky has. Mary Beth Moylan and Linda E. Carter, *Clemency in California Capital Cases*, 14 Berkeley Journal of Criminal Law 37 (2009) (noting the variety of approaches states with capital punishment have taken with regard to clemency). It is by no means clear, however, as the trial court observed, that more formal clemency proceedings have either been intended to enhance, or have had the effect of enhancing a death-sentenced inmate's chances of being granted clemency. Moylan and Carter, 14 Berkeley Journal of Criminal Law at 103 Appendix B (noting that several states providing for some sort of board review of capital clemency requests also require a board recommendation before the Governor may grant clemency).[9]

Be that as it may, we are not persuaded by Appellants' assertion that "a comparison of the procedures provided in other states is indicative of what proceedings are necessary to comport with" the Fourteenth Amendment. The U.S. Supreme Court, rather, has explained that it has always accorded substantial deference to state legislative judgments in matters of criminal procedure, and thus "ha[s] found criminal process lacking only where it 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Herrera*, 506 U.S. at 407–408, 113 S.Ct. 853 (quoting *Medina v. California*, 505 U.S. 437, 445–446, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)).[10] "'Historical practice,' the Court has explained, 'is probative of whether a procedural rule can be characterized as fundamental,'" 506 U.S. at 408, 113 S.Ct. 853 (quoting *Medina*, 505 U.S. at 446, 112

---

chooses. Margaret Colgate Love, *The Pardon Paradox: Lessons of Clinton's Last Pardons*, 31 Cap. U.L.Rev. 185 (2003) (former Pardon Attorney arguing that while President's pardon power is unfettered its exercise is more acceptable to the public if submitted to the Pardon Attorney process).

9. Since Kentucky reinstated the death penalty in 1976, three persons have been executed, only one of whom requested clemency: two other persons sentenced to death have had their sentences commuted to life without parole. Governor Patton commuted Kevin Stanford's sentence because Stanford was only seventeen-years-old at the time of his offense. Governor Fletcher commuted Jeffrey Leonard's sentence because, in the Governor's view, Leonard was not well-represented at trial. American Bar Association Death Penalty Moratorium Implementation Project, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Kentucky Death Penalty Assessment Report*, p. xxx (Dec. 2011). Appellants rely to a considerable extent on criticisms of the Kentucky clemency scheme in the ABA's *Death Penalty Assessment Report* (The *Report* deplores particularly the facts that Section 77 does not require a public clemency hearing and does not require the Governor to meet personally with death-row

inmates seeking clemency.) However, we are not persuaded by Appellants' claim that those criticisms should be read into the Due Process Clause. *Cf. Marek v. State*, 8 So.3d 1123 (Fla.2009) (rejecting claim that *Assessment Report* criticisms of Florida's clemency system implied a constitutional violation).

10. We assume here, as do Appellants, that clemency procedures may be thought a part of the criminal process and so invite due-process analysis under *Medina*. Other approaches are possible, of course, for example *Weiss v. United States*, 510 U.S. 163, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (applying deferential due process standard to Congress's provisions relating to terms of office for military judges), but even under the more liberal *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), balance-of-interests approach the result would be the same, since Appellants have made no showing that the balance of interests necessitates the procedures they seek. Indeed, they propose an overhaul of the clemency scheme established by our state Constitution without suggesting that it would have any tendency whatsoever to prevent "erroneous" clemency decisions.

S.Ct. 2572), but contemporary practice, particularly if that practice is diverse, is "of limited relevance to [the] historical inquiry." *Herrera*, 506 U.S. at 410, 113 S.Ct. 853. Thus, even if executive clemency were deemed a principle of justice rooted deeply enough in our tradition as to be characterized as fundamental (and it should be recalled that "the Constitution [of the United States] ... does not require the States to enact a clemency mechanism." *Herrera*, 506 U.S. at 414, 113 S.Ct. 853), recent, diverse developments among the states regarding clemency proceedings could not be so characterized and so could not be thought to extend Due Process Clause requirements beyond the "*minimal procedural safeguards*" recognized in *Woodard.*

Even if clemency practice in other states were as unlike Kentucky's practice as Appellants maintain, therefore,[11] it is simply not the case, as Appellants would have it, that contemporary practice in some states becomes a standard imposed by the federal constitution's Due Process Clause on all the states. *McKane v. Durston*, 153 U.S.

684, 688, 14 S.Ct. 913, 38 L.Ed. 867 (1894) (explaining that while "in most[1] of the states of the Union a defendant convicted of a criminal charge other than murder has the right ... to give bail pending ... appeal," that fact does not make that right "a necessary element of due process of law."); *Medina v. California, supra; Martin v. Ohio*, 480 U.S. 228, 232, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) (observing that "'the fact that a majority of the States have now assumed the burden of disproving affirmative defenses—for whatever reasons—[does not] mean that those States that strike a different balance are in violation of the Constitution.'") (quoting *Patterson v. New York*, 432 U.S. 197, 211, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). Other states have different approaches,[12] but that fact does not mean that Kentucky's Governor-centered approach to clemency violates the Fourteenth Amendment's Due Process Clause. The trial court correctly rejected Appellants' claim to the contrary.

In sum, while the U.S. Supreme Court's *Herrera* Opinion called attention to one of

---

11. In fact, however, others surveying state clemency practices have observed that while the states have adopted a wide variety of approaches to executive clemency, none provides the adjudication-like process Appellants contend is due. Sarah Lucy Cooper and Daniel Gough, *The Controversy of Clemency and Innocence in America*, 51 Cal. West. L.Rev. 55 (2014) (surveying state clemency practices and concluding that generally the process provided is relatively minimal). Nor is Kentucky's reliance on the Governor for clemency determinations unique. As of May 2014, at any rate, thirteen states vested the pardon power in their Governors. Cooper and Gough at 72.

12. Appellants focus on some states' provision of a hearing right in the clemency process as well as some states' requirement that the executive charged with the clemency decision interview the death-row inmate. They also refer favorably to states where input is sought from the sentencing court, prosecutor and

victims. While not in the context of the clemency process, Kentucky has provided by statute for reports/statements from these same persons, assuring that the Governor will have input from them about the defendant and the case. These reports/statements, prepared as of the time of sentencing, provide a means of conveying information relevant to the death-row inmate's case that would not otherwise be part of the court proceedings or court documents. See KRS 532.075 (trial court to prepare standard questionnaire about defendant and case in any matter where death penalty is imposed); KRS 439.370 (Commonwealth's attorney to prepare statement regarding trial to be transmitted with defendant to the penal institution with commitment papers); KRS 421.520 (victim impact statements to be prepared and forwarded to officer responsible for preparation of presentence investigation report). These documents are in a death-row inmates file and available to the Governor during the clemency process.

clemency's traditional roles as a "fail safe" mechanism, that case did not suggest that clemency procedures, even in death penalty cases, need provide more than the "*minimal* procedural safeguards" the Court in *Woodard* deemed due. On its face, Section 77 of the Kentucky Constitution does not violate those federal constitutional requirements. While Section 77 effectively leaves clemency procedures as well as clemency decisions to the Governor, Appellants have advanced no reason to suppose that the Governor cannot or will not provide procedures as well as decisions that avoid the sort of arbitrariness the Supreme Court said might taint a clemency determination. Appellants, in other words, have failed to state a claim for relief, and accordingly we hereby affirm the trial court's Order dismissing their complaint.

All sitting. All concur.